VICKI MURPHY, a minor, by ELMER MURPHY, her father, individually and as next friend, appellee, v. CITY OF WATERLOO, appellant.

No. 51031.

(Reported in 123 N.W.2d 49)

558

Appeal from Black Hawk District Court—CARROLL E. ENGELKES, Judge.

JULY 16, 1963.

REHEARING DENIED SEPTEMBER 17, 1963.

Charles J. Pickett, of Waterloo, for appellant.

Kildee, Keith, Gallagher & Lybbert, of Waterloo, for appellee.

PETERSON, J.—This is an action for damages against defendant-City. Vicki Murphy was a twelve-year-old girl in 1959. When standing on a sidewalk on Edwards Street in Waterloo she was violently pushed from the rear by a five-year-old boy. She was about 4 feet from Virden Creek, which was 9 feet deep at the point where it connects with the Waterloo storm sewer system. She was pushed into the creek; struck her head on some

cement blocks at the bottom of the creek, and sustained a concussion of her skull. The jury rendered verdict in her favor in the amount of $10,000, and rendered a verdict for her father for hospital and doctor bills paid by him in the amount of $736.80. Defendant appealed.

I. For many years a creek tunnel existed under Edwards Street in defendant-City. The tunnel crossed under the street at an angle, extended several feet south of the street and connected with said creek. A vertical wall had been built by the city on each side of the creek connecting with the southern end of the tunnel. The area between the sidewalk and the creek was even with the sidewalk and at the point where Vicki fell the creek was partially in the Murphy yard.

Although the City did not have title to this strip of land, or the land on which the tunnel extension and walls were constructed, it maintained and controlled the tunnel and creek walls. In 1947 and 1948 under the inspection, supervision and control of the City, the creek and its walls had all been repaired and rebuilt by defendant-City. Prior to such time there was a guardrail between the sidewalk and the drop-off, but it fell down when one of the walls collapsed in 1947 and was never put back when the walls were repaired and rebuilt by the City. At the time of the accident there was no fence nor barrier of any kind between the sidewalk or Murphy yard and the creek.

Vicki lived with her parents, Mr. and Mrs. Elmer Murphy, on the south side of Edwards Street. A public grade school was located on Edwards Street about a block west of the Murphy home. Hundreds of small school children passed the spot every day. They were usually on the sidewalk, but they pushed over into the strip of land between the sidewalk and the creek so that it became worn bare and packed hard like a cement walk.

The following copies of exhibits present a visual view of the Murphy home, Edwards Street, and Virden Creek where it connects with the Waterloo storm sewer system.

Mrs. Murphy, as the only eyewitness, saw what happened through the middle window shown on defendant's exhibit '1'. (See mark "x" on window.)

DEFENDANT'S EXHIBIT '3'

Vicki was a member of the school patrol. Her duties included patrolling the intersection of Edwards Street and Logan Avenue, which included the sidewalk and creek tunnel in question.

It is pertinent that we show Mrs. Murphy's evidence as to what happened in connection with Vicki being pushed and her early care by the doctor. The testimony was as follows:

"Q. Now, inviting your attention to 12:45 or possibly a few minutes earlier or later, did you have occasion to look out of the west window of your home into the area of Virden Creek and the drop-off? A. Yes. I saw a little boy running back and forth across the wall.

"Q. I hand you plaintiff's Exhibit 'A', and I ask you to make an 'X' on this diagram where Vicki was standing at that time? A. Right about there. [See "X" on Exhibit 'A']

"Q. Now this, Mrs. Murphy, indicates the sidewalk. You have testified that she was standing on the sidewalk. A. On the sidewalk.

"Q. What happened, then? A. Well, when this little boy got up behind her back he all of a sudden ran toward her and just lunged out with all his might, and he hit her about at the waistline or possibly above it. Just about the middle of her back.

"Q. What happened, then? A. She staggered and stumbled, half falling, several feet before she went over the edge. I thought she would get her footing, but she didn't. On the very edge I saw her go back like this for a minute and then fall over the edge.

"Q. Whereabouts along the edge did she fall over the edge? Would you indicate that on Exhibit A? A. Right about here I would say.

"Q. Would you put a 'Z' where the edge was that she went over? [See Exhibit 'A']

"I went to Vicki and she was sprawled across two cement slabs lying on her face. I picked her up and carried her to the house with the help of a man. I called Dr. Gerard who arrived about the time she was regaining consciousness. The whole side of her head swelled up and her right eye pupil went over toward her nose."

II. Defendant assigns eight alleged errors as follows: 1. Plaintiff did not prove negligence justifying submission of the case to the jury. 2. In not instructing the jury that some of the evidence indicated Vicki was not on the sidewalk when she was pushed by the small boy; that the jury was entitled to this theory of defendant's case; that the court refused to give an instruction to this effect requested by defendant. 3. That there was insufficient evidence to sustain the amount of the verdict in favor of Vicki. 4. That the jury should have been instructed with reference to contributory negligence of Elmer Murphy, Vicki's father, in connection with the expenses incurred by him for Vicki. 5. That the evidence of the technician who took an electroencephalogram was wrongfully admitted and interpreted. 6. That the court refused to allow the small boy, five years old who pushed Vicki, to testify. 7. The court refused to admit in evidence a written statement of Mrs. Murphy to the police department of Waterloo, which statement was contradictory of, and inconsistent with, Mrs. Murphy's testimony at the trial. 8. In admitting in evidence photographs showing precautions taken after the accident for the prevention of future accidents.

III. Defendant contends plaintiff did not present sufficient evidence of negligence to justify the court in submitting the case to the jury.

In addition to the factual statement, as heretofore shown, it appears in the record that sometime prior to 1946 a fence had been erected around what would be called the head of Virden Creek. The fence was close to the edge of the creek walls and created a barrier against anyone who might come up to the place of the sudden drop into the bed of the creek. Through the passage of years this fence became dilapidated and worn out. A short time prior to 1947 two of the sidewalls of the creek fell in. In 1947 the City entered into a contract with a contracting firm by the name of Rooff & Spencer for the rebuilding of the walls and placing a cap upon the top of the walls. The improvement cost $17,927.05. The work was inspected by a City inspector and after being approved was paid for under a Resolution duly adopted by the City Council.

When this work was done the City did not re-erect the fence which had previously existed around the head of Virden Creek. As stated, supra, the head of the creek ran up to approximately four feet from the sidewalk at the closest point to about eight feet as the creek proceeded in a southeasterly direction.

The important angle of approach to the matter of the City's liability in this case is the proximity of the creek to a City sidewalk. There was a hazard in the situation by reason of failure to erect any fence or barrier at the head of the creek or around the nine-foot drop into the creek.

Section 389.12, 1958 Code, provides:

"They [cities] shall have the care, supervision, and control of all public highways, streets, avenues, alleys, public squares, and commons within the city, and shall cause the same to be kept open and in repair and free from nuisances."

The matter of the liability of a city or town in case of defects in or near streets or sidewalks had had the consideration of this court in an early case and in recent cases. An early case is Manderschid v. Dubuque, 29 Iowa 73, 87, 4 Am. Rep. 196; later cases are Bixby v. Sioux City, 184 Iowa 89, 96, 164 N.W. 641, 644; Nicholson v. Des Moines, 245 Iowa 270, 60 N.W.2d 240, 44 A. L. R.2d 616.

Appellant contends there was no liability because the accident which happened to Vicki was not one which could reasonably be anticipated, even with the creek close to the sidewalk.

In the case of Priebe v. Kossuth County Agricultural Association, Inc., 251 Iowa 93, 100, 99 N.W.2d 292, 296, the court said: "In order to constitute negligence it is not necessary that defendant could have foreseen the particular injury that resulted provided it should have foreseen its omission to act would probably result in injury of some kind to some person."

In McCormick v. Sioux City, 243 Iowa 35, 38, 50 N.W.2d 564, 566, the court said: "Where reasonable minds might differ as to whether an accident could or should have been reasonably anticipated from the existence of the alleged defect or obstruction the question as to the negligence of the city becomes a question for the jury."

In Whitlatch v. Iowa Falls, 199 Iowa 73, 75, 201 N.W. 83, 85, the court said: "The duty to maintain the streets in a reasonably safe condition for travel includes, when reasonably necessary, the erection of barriers or guardrails along grades and at other dangerous places."

In Nicholson v. Des Moines, supra, decedent was proceeding along a cinder sidewalk in the dark. At one place close to a bridge the cinder sidewalk curved toward the bridge and then onto the sidewalk on the bridge. When the traveler reached the place of the cinder sidewalk curve, he apparently failed to see the curve in the dark and proceeded in a straight line; fell into a pit in the river and lost his life. The case was submitted to the jury on the theory that a city's duty to use reasonable care in maintaining its streets in a safe condition applied not only as to the street or sidewalk itself, but as to conditions reasonably close to or adjacent to the street or sidewalk.

In view of such decisions and several others similar thereto, we hold there was sufficient evidence in the case at bar to require the trial court to submit the case to the jury.

IV. Appellant claims the court erred in failing to submit its theory of the case in connection with the point at which Vicki was pushed by the little boy from the sidewalk or the Murphy yard. This is the assignment principally emphasized and urged by defendant.

It is the position of appellant that the court should have instructed the jury if Vicki was pushed into the creek from her yard the defendant was not negligent, and the verdict should have been for the defendant.

■ Appellant takes the position that it properly raised this question in pleadings and evidence. In the pleadings defendant failed to allege this specific affirmative defense. We have often held that if a defendant desires to have its theory of affirmative defense submitted in an instruction such affirmative defense must be raised in the answer. Hart v. Hinkley, 215 Iowa 915, 919, 247 N.W. 258; Wise v. Outtrim, 139 Iowa 192, 117 N.W. 264, 130 Am. St. Rep. 301; Clark v. Monroe County Fair Assn., 203 Iowa 1107, 212 N.W. 163; First National Bank v. Cook, 171 Iowa 41, 153 N.W. 169.

■ Appellant contends that in plaintiff's petition an allegation was made that Vicki was on the sidewalk when she was pushed over the wall and into the creek. It further contends that a denial of this statement in the answer is sufficient to require submission of the question in an instruction by the court. It is true there was some variance in the testimony as to this point, although any such difference in the evidence was not clear. Appellant's contention is based largely upon the direction in which Vicki was looking when she was pushed rather than upon any definite statement by any witness that she was not on the sidewalk. We hold that under the circumstances as above outlined it was not reversible error on the part of the trial court to refuse to instruct the jury as to this matter.

■ V. Appellant contends there was insufficient evidence as to Vicki's injury to sustain the amount of the verdict of the jury.

Appellant takes the position that Vicki's injury was simply a slight depression in the skull area and slight injury to her leg and her finger. The record discloses more severe injuries, which the jury had a right to take into consideration. The case was tried about two and one-half years after the incident happened. Under the testimony of her parents and her physician it appeared without any conflict that she was still having headaches, and hearing and sight loss. The evidence further disclosed that

she had a permanent injury in the form of a crooked finger. She was still suffering at the time of trial from dizziness and emotional disturbances which affected her schoolwork, and the doctor testified as to a certain degree and probability of permanent injury. We quote from the doctor's testimony with reference to Vicki's injury:

"Q. Doctor, was there any hematoma, or hemorrhage, around the eye or around any portion of these fractures or in the brain itself? A. There was evidence of hematoma, collection of blood, on the outside of the skull between the skin and the fracture, and that was evident over the frontal area, where she had this large fracture. It was evidenced over the occipit, where she had a fracture there, and the hemorrhage went down and invaded the eye area between the eyeball. * * *

"A. Yes. This is a skull. [Looking at an exhibit] She had a fracture that went through this area above the orbit, involved both frontal bones, more on the right side, and went back from the parietal bone. She also had a fracture in the occipit that went up in this area, and then this fracture extended down to the foramen magnum, where the spinal cord hooks on. * * *

"A. She had a hearing loss because the nerve that goes to the middle ear was damaged when this fracture occurred. * * *

"A. Frequently you will get adhesions between the brain and the covering of the brain, and this is one of the things that we know causes epilepsy. This usually can be picked up, if they have, with an electroencephalogram.

"Q. Doctor, based upon reasonable medical certainty, do you have an opinion as to whether or not this child may in later life develop convulsive epilepsy? A. I think any child or adult that has a severe blow to the skull has some chance of developing later epilepsy.

"Q. Doctor, I wonder if you would give me the degree of possibility? A. That's one of the reasons we sent her down to Iowa City. She does show slight abnormal deformity in the electroencephalogram. Knowing the severity of the skull fracture, I think she has a chance of three to five percent of developing epilepsy. * * *

"A. As we examined the child now [just before the trial],

both here and at Iowa City, there is no evidence now, other than that abnormal electroencephalogram, that she has any permanent disability, either medically or neurologically. Knowing that she had the severe skull fracture, and knowing she does have a little abnormal electroencephalogram, she has a chance, which I have mentioned between three and five percent of developing epilepsy, which to her is a type of permanent disability. * * *."

Cross-examination:

"Q. Do you know whether or not there is any scarring between the skull in this case? A. No, we know that if we take electroencephalograms on one hundred people, we will probably have three abnormal ones in one hundred. Maybe one of those three will be caused by what we are talking about. * * *

"Q. Do you feel, that because of this electroencephalogram, there is a possibility of some damage? A. Yes. In other words, I would feel better about the whole thing if it turned out to be a normal electroencephalogram.

"Q. Is there any more than a possibility? Would you say it was a probability that there might be a little damage? A. I think it's a probability, yes.

"Q. Could you say to a reasonable certainty that this electroencephalogram indicated that something was a little wrong? A. Yes, there is some reason for this abnormal electroencephalogram. As I told you before, there is more than one reason for it, but certainly it isn't normal."

We hold there was sufficient evidence in the record to justify the amount of the verdict rendered by the jury.

VI. Appellant contends the court erred in instructing the jury that if they found in favor of Vicki as to her personal injuries they should also find for her father, plaintiff, to the extent of the amount of the doctor and hospital bills.

Appellant urges it was necessary that the court instruct, and the jury find, that Mr. Murphy independently was not guilty of contributory negligence in connection with Vicki's fall and injury.

There is no merit in this assignment. It is well settled in Iowa and generally elsewhere that a parent's negligence can-

not be imputed to the child in its action against a third person to recover for negligent injury to the child.

In Wheatley v. Heideman, 251 Iowa 695, 711, 712, 102 N.W.2d 343, 353, 354, we said: "* * * But if defendant's negligence * * * was a substantial factor in causing such injury, negligence of either parent would not be a defense." Also see Primus v. Bellevue Apts., 241 Iowa 1055, 1064, 44 N.W.2d 347, 353, 25 A. L. R.2d 565; Ives v. Welden, 114 Iowa 476, 478, 87 N.W. 408, 54 L. R. A. 854, 89 Am. St. Rep. 379.

█ We hold the court's failure to give an instruction to the jury on this question as requested by appellant was not reversible error.

VII. Appellant contends it was reversible error that the court allowed an electroencephalographer technician, who was not a practicing physician, to testify.

The electroencephalographer was Dr. John R. Knott of the University Hospital at the University of Iowa. His qualifications and his field of work can best be shown by quoting from his testimony:

"Since 1941 I have been in the Division of Electroencephalography at the Psychopathic Hospital at the State University of Iowa. I was a charter member and past president of the American Electroencephalographic Society which has 108 members. Those persons in the United States truly able to do electroencephalography number about 65. The Society has a Board of Qualification and I was on that board nine years and am a diplomat thereon. I have a certificate of qualification.

"An electroencephalogram, called for short an E.E.G., is a recording of the electrical currents in the brain; * * *."

█ Doctor Knott was very careful not to encroach upon the field of a physician. He only testified as to the facts as he found them. He did not give opinion evidence as to the effect of the E.E.G. examination. This is clearly evidenced by his testimony as follows:

"Q. Does this E.E.G. indicate a change in the nerve structures of Vicki Murphy's brain, Doctor? A. This would be the conclusion drawn by any electroencephalographer that there

would be a change in the nerve cells in the brain other than would be expected for a child of that age, yes, Sir.

"Q. Just to sum this up, this E.E.G. showed you that there was abnormality in the nerves in the brain of this child? A. If I may restate that so I can answer it. This E.E.G. deviated from normal. An earlier injury could well have caused this E.E.G. abnormality.

"Q. This is based on probability? A. This is based upon probability and upon the available information in the journals in this area. This would be the consensus of electroencephalographers. This E.E.G. run two years or more after the accident would suggest to me that there is an apparently long range change."

We find no reversible error in this assignment.

VIII. Appellant contends Monty Mourhouse, the five-year-old boy, should have been permitted to testify.

The decision as to the admission or exclusion of the testimony of a child under fourteen years of age is primarily allocated to the trial court. As to when witnesses are competent to testify appears in section 622.1, 1962 Iowa Code, and is as follows: "Every human being of sufficient capacity to understand the obligation of an oath is a competent witness in all cases, except as otherwise declared." Judge Ladd carefully considered and analyzed the subject in the case of State v. King, 117 Iowa 484, 486–488, 91 N.W. 768. The Justice said: "When a child under fourteen years of age is called as a witness the preliminary inquiry should be directed solely to ascertaining whether sufficient capacity is possessed to understand the obligation of an oath. * * * Treatment of knowledge of God and the elementary precepts of Christianity as controlling seems to rest, in part, at least, on the old rule exacting faith as one of the necessary qualifications to give testimony. [Four citations] * * * The decision as to capacity is primarily for the Judge, * * * the court sees the witness, notices his manner, observes the apparent degree of intelligence and maturity of mind; and, as these matters cannot be photographed in the record, its decision will not be disturbed unless clearly erroneous." .

The trial court observed these precautions with reference to Monty. The following are excerpts from the examination:

"The Court: Do you know what it means to tell the truth? The Witness: No. * * * [Defendant's counsel interrogated Monty somewhat at length. After such interrogation the Court said]: I am going to ask a few questions. Monty, when you came up here I asked you if you knew the difference between right and wrong. You know the difference between right and wrong? Did you hear me? The Witness: No. The Court: * * * I am inclined—to feel, * * * that we can't permit this witness to testify. Under the circumstances we won't permit him to testify."

Discretion as to Monty testifying was lodged in the court. The court, after careful examination, decided he should not. This was not "clearly erroneous" and we will not disturb the court's decision.

IX. Appellant urges the court should have admitted Exhibit 6 which was a statement made by Mrs. Murphy to the Police Department at Waterloo, the next day after Vicki's injury. It is the position of appellant's counsel that Exhibit 6 should have been admitted for the purpose of impeaching the testimony given by Mrs. Murphy at the trial.

We have repeatedly said that when written statements of this type are admitted in evidence they are not substantive evidence of the matters therein contained, but are admissible only to discredit or impeach the witness. Christensen v. Iowa State Highway Commission, 252 Iowa 1351, 110 N.W.2d 573; Law v. Hemmingsen, 249 Iowa 820, 835, 89 N.W.2d 386, 397, and citations; Stevens v. Gear, 240 Iowa 1348, 1357, 39 N.W.2d 408, 414; State v. Powell, 237 Iowa 1227, 1245, 24 N.W.2d 769, 780; Annotations 133 A. L. R. 1454, 1455.

Appellant's position is that Mrs. Murphy testified in the trial of the case that Vicki was on the sidewalk when Monty pushed her. Appellant interprets Exhibit 6 as different from her statement made at the trial. We do not agree. In the statement made to the police Mrs. Murphy did not say anything about where Vicki was standing when Monty pushed her. She did not say to the police she was standing on the sidewalk; she

did not say she was not standing on the sidewalk. At any rate, there is not such direct conflict between the statement, Exhibit 6 and her testimony at the trial as to make the admission of Exhibit 6 of any importance. We find no error here.

X. Appellant claims the court wrongfully admitted in evidence photographs showing precautions taken after the accident, for the prevention of future accident.

The record shows that immediately after Vicki's accident defendant-City erected a fence completely around the head of Virden Creek, running back for quite a number of feet along the walls on each side of the creek. The trial court clearly instructed as to this matter as follows:

"Instruction No. 6. Evidence was admitted tending to show the erection of a fence at the site of the accident a short time subsequent to the accident.

"You are instructed that such evidence shall not be considered in any manner by you as bearing upon any issue of alleged negligence of the Defendant; nor shall you consider its erection after the accident, if you so find, as any admission of any inadequacy or responsibility by the Defendant for the conditions as they existed at the time of the accident."

It has often been held that evidence as to repairs made after the occurrence of the claimed negligence was not admissible as having any bearing upon the negligence.

See 20 Am. Jur., Evidence, section 282, page 267, where it is stated:

"The weight of authority is to the effect that evidence of repairs or alterations made after an accident or injury and of precautions taken to prevent injuries of like character after the happening of the one complained of is not competent upon that issue as to the condition of a place or an appliance at the time of an alleged injury."

Subject to the cautionary statements in the instruction, the exhibits were admissible as tending to show the City exercised control over the place in question, and that it was close enough to the street to be subject to section 389.12, 1958 Code, even though on land not owned by the City.

This was a clear and decisive statement by the court advis-

ing the jury that they should not pay any attention to the repairs or the precautionary fence erected by the City after Vicki's injury.

In view of the trial court's careful and specific instruction to the jury as to this phase of the exhibits, we find no reversible error.

The case is—Affirmed.

GARFIELD, C. J., and HAYS, LARSON, THOMPSON, SNELL and MOORE, JJ., concur.

STUART, J., dissents.

THORNTON, J., takes no part.