STATE, Respondent, v. STANISLAWSKI, Appellant.*

*No. State 119. Argued January 4, 1974.—Decided April 2, 1974.*
(Also reported in 216 N. W. 2d 8.)

* Motion for rehearing denied, without costs, on June 4, 1974.

734

1

For the appellant there were briefs and oral argument by *Jerome A. Maeder* of Wausau.

For the respondent the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

ROBERT W. HANSEN, J. Involved in this appeal is the issue of admissibility of polygraph evidence at time of trial, for impeachment or corroboration, on the question of credibility. Defendant's counsel urges that we review the long-standing rule in this court against admitting such evidence. We agree that the time has come to do so.

*Polygraph evidence.*

*Wisconsin cases.* Forty-plus years have come and gone since this court rejected polygraph evidence for any purpose and under any circumstances. In the case involved, *State v. Bohner*,[1] since followed,[2] this court held that " '. . . the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made.' "[3] That test and the quotation come from a federal circuit court case, *Frye v. United States*.[4] The test of "general acceptance in the particular field in which it belongs,"[5] has been criticized as "antiquated on the day of its pronouncement,"[6] but has been

---

[1] (1933), 210 Wis. 651, 657, 246 N. W. 314.

[2] *See: Meyer v. State* (1964), 25 Wis. 2d 418, 425, 130 N. W. 2d 848; *State v. Baker* (1962), 16 Wis. 2d 364, 368, 114 N. W. 2d 426; *State v. Perlin* (1955), 268 Wis. 529, 537, 68 N. W. 2d 32; *LeFevre v. State* (1943), 242 Wis. 416, 425, 8 N. W. 2d 288.

[3] *State v. Bohner, supra,* footnote 1, at page 658.

[4] (D. C. Cir. 1923), 293 Fed. 1013.

[5] *Id.* at page 1014, stating: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

[6] Edwin Conrad, *New Horizons in Scientific Evidence,* 54 Marquette L. Rev. (1971), 342, 343, the author stating: ". . . While

often cited and followed,[7] with little mention of the fact that the polygraph evidence in *Frye* was vindicated when a third person confessed to the murder there involved.[8] We need not reject the *Frye* test to have reason to inquire, forty-plus years later, whether the lack of general acceptance, then found to exist, still persists.

*"General acceptance."* Under the test of general acceptance or scientific standing in the field in which it belongs, there has been a marked change in acceptance of polygraph testing in the forty-plus years since *Bohner* and fifty-plus years since *Frye*. There is a widespread use of polygraph testing by industries, banks, insurance companies, police departments, and governments, including the armed forces.[9] The business of private polygraph

the principle had some merit in rendering the results of lie-detector or polygraph tests inadmissible, the quoted rule was antiquated on the day of its pronouncement. Under the principle of the *Frye* case, no scientist could testify that an atom could be split, that atomic fission was useful or that Man could implant his footsteps on the moon. The artificial and already obsolete principle established by the *Frye* case, requiring general scientific acceptance of the instrumentality of proof in the particular field in which it belongs, stood unchallenged, despite the fact that it was in direct contradiction to liberal rules of admissibility of expert testimony. . . ."

[7] *See:* Cases cited in 3A Wigmore, *Evidence* (Chadbourn rev. 1970), pp. 946–949, sec. 999. *See also:* McCormick, *Evidence* (2d ed. 1972), pp. 504–507, sec. 207; 3 Torcia, *Wharton's Criminal Evidence* (13th ed.), p. 249, sec. 630; 22A C. J. S., *Criminal Law*, p. 525, sec. 645 (2); 32 C. J. S., *Evidence*, p. 722, sec. 588 (4); 29 Am. Jur. 2d, *Evidence*, pp. 923–925, sec. 831.

[8] W. Wicker, *The Polygraph Truth Test and the Law of Evidence*, 22 Tenn. L. Rev. (1953), 711, 715.

[9] *See:* J. Reid & F. Inbau, *Truth and Deception: The Polygraph ("Lie-Detector") Technique* (1966), 233, 234; Note, 48 N. Y. U. L. Rev. (1973), 339; J. Skolnick, *Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection*, 70 Yale L. J. (1961), 694, 695; S. Highleyman, *The Deceptive Certainty of the "Lie Detector,"* 10 Hastings L. J. (1958), 47, 48; P. Trovillo, *Scientific Proof of Credibility*, 22 Tenn. L. Rev. (1953), 743; W. Wicker, *The Polygraphic Truth Test and the Law of Evidence*, 22 Tenn. L. Rev. 713,

examiners increased eight to ten times in the decade 1950–1960.[10] This increased use and acceptance reflects the establishing of polygraph tests, conducted by a competent examiner, as having gained " 'standing and scientific recognition among physiological and psychological authorities' "[11] in their particular field. Experts in the field give a high degree of accuracy or dependability to polygraph examinations, conducted by a competent examiner.[12] Polygraph test accuracy is viewed as comparing favorably with other types of expert testimony

714. *See also: Hearings Before a Subcomm. of the House Committee on Government Operations on Use of Polygraphs as "Lie Detectors" by the Federal Government*, 88th Cong., 2d Sess. (1964).

[10] Coghill, *The Lie Detector in Employment* (Cornell Industrial Labor Relations Library Key Issues Series No. 1 at pages 2, 3 (1968)), cited in Note, 73 Col. L. Rev. (1973), 1120.

[11] *State v. Bohner, supra,* footnote 1, at page 658, citing *Frye v. United States, supra.*

[12] Estimates of accuracy: 94 percent accurate, 5 percent inconclusive, 1 percent known errors—J. Reid & F. Inbau, *Truth and Deception: The Polygraph ("Lie Detector") Technique, supra,* footnote 9, at 234, 235; 87.75 percent accurate—F. Horvath & J. Reid, *The Reliability of Polygraph Examiner Diagnosis of Truth and Deception,* 62 Journal of Criminal Law, Criminology and Police Science (1971), 276, 278, 279; 96 percent accurate, 3 percent inconclusive, 1 percent maximum known error—R. Pfaff, *The Polygraph: An Invaluable Judicial Aid,* 50 A. B. A. J. (1964), 1130, 1132, citing Arther and Caputo, *Interrogation for Investigators* (1959) 214; 2 to 5 percent error—W. Wicker, *The Polygraphic Truth Test and the Law of Evidence, supra* (1953) footnote 9, 711, 713; 2 to 3 percent known error—E. Levitt, *Scientific Evaluation of the "Lie-Detector,"* 40 Iowa L. Rev. (1955), 440, 450; 75 to 80 percent accurate, 15 to 20 percent inconclusive, 5 percent error—Note, *The Polygraph and Probation,* 9 Idaho L. Rev. (1972), 75, 76; 80 percent accurate, 17 percent inconclusive, 3 percent error—E. Cureton, *A Consensus as to the Validity of Polygraph Procedures,* 22 Tenn. L. Rev. (1953), 728, 729. *But see:* As high as 25 percent error—S. Highleyman, *The Deceptive Certainty of the "Lie Detector," supra* (1958–1959), footnote 9, at 47, 62; 70 percent accurate—L. Burkey, *The Case Against the Polygraph,* 51 A. B. A. J. (1965), 855, 856.

such as that given by psychiatrists, document examiners and physicians.[13]  In one court case, experts testified ". . . that the reliability of the opinion of a qualified polygraph expert was higher than the opinions of ballistics experts and as high as the opinions of fingerprint experts."[14]  While experts agree that the training and experience of the examiner are crucial in attaining accurate results,[15] those most familiar with the field believe that polygraph examinations constitute a reasonably reliable diagnosis of truth and deception responses to questions asked.[16]  To traditional admission of expert

[13] See: A. Dabrowski, *The Polygraph Revisted: An Argument for Admissibility*, 6 Crim. L. Bull. (1970), 63, 70; J. Reid & F. Inbau, *Truth and Deception: The Polygraph ("Lie-Detector") Technique, supra,* footnote 9, at pages 255–257. See also: F. Horvath & J. Reid, *The Polygraph Silent Answer Test,* 63 Journal of Criminal Law, Criminology and Police Science (1972), 285.

[14] *United States v. Ridling* (D. C. Mich. 1972), 350 Fed. Supp. 90, 93, the court in a perjury case holding polygraph evidence admissible but requiring an examination by a court-chosen examiner before an examination by an expert chosen by the defendant can be admitted into evidence.

[15] As to importance of training and experience of polygraph examiners, see: J. Reid & F. Inbau, *Truth and Deception: The Polygraph ("Lie-Detector") Technique, supra,* footnote 9, at 235, 257, 280; E. Levitt, *Scientific Evaluation of the Lie-Detector, supra,* footnote 12, at 440, 454; Note, 48 N. Y. U. L. Rev., *supra,* footnote 9, 358, 359 (noting that a number of states have statutes regulating the licensing of polygraph operators) ; see also: J. Skolnick, *Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection, supra,* footnote 9, at 707; F. Horvath & J. Reid, *The Reliability of Polygraph Examiner Diagnosis of Truth and Deception, supra,* footnote 12, at 276–279, stating where examiners with more than a year's experience achieved an accuracy rate of 91.4 percent, examiners with four to six months' experience had only a 79.1 percent of accuracy.

[16] J. Reid & F. Inbau, *Truth and Deception: The Polygraph ("Lie-Detector") Technique, supra,* footnote 9, at pages 234, 257, stating: "Our actual case experiences over the years have involved the Polygraph examination (either personally or under our direct supervision) of over 35,000 persons suspected or accused of criminal

testimony as to fingerprints, ballistics tests, blood tests and handwriting analyses, the past forty or fifty years have seen courts recognize as admissible judicial aids expert testimony as to Nalline tests for narcotics,[17] neutron activation analyses,[18] blood alcohol tests,[19] breathalyzer tests for alcoholic content,[20] voiceprints,[21] electroencephalographs,[22] police artist drawings [23] and infrared spectrometer chromatography.[24] We find it

offenses or involved in personnel investigations initiated by their employers. On the basis of that experience we are confident that the technique, *when properly applied by a trained, competent examiner,* is very accurate in its indications. The percentage of *known* errors with the technique used in the laboratories of John E. Reid and Associates is less than 1 percent. Of the remainder no diagnosis at all is attempted in about 5 percent of the cases, because of such factors as the physiological or psychological impairment of the subjects.

"...

"The Polygraph technique which we have described, when properly used by competent, experienced examiners, possesses a very high degree of accuracy. This we can conscientiously report from our experience in the examinations, personally, or in the supervision of the Polygraph examinations, of over 35,000 subjects. It is our view, therefore, that the results of a competently conducted Polygraph examination should be accepted as evidence."

[17] *See: People v. Williams* (1958), 164 Cal. App. 2d Supp. 858, 331 Pac. 2d 251.

[18] *See: State v. Coolidge* (1969), 109 N. H. 403, 260 Atl. 2d 547.

[19] *See: Breithaupt v. Abram* (1957), 352 U. S. 432, 77 Sup. Ct. 408, 1 L. Ed. 2d 448.

[20] *See: People v. Garnier* (1959), 20 Ill. App. 2d 492, 156 N. E. 2d 613.

[21] *See: United States v. Wright* (1967), 17 USCMA 183, 37 CMR 447.

[22] *See: Murphy v. Waterloo* (1963), 255 Iowa 557, 123 N. W. 2d 49.

[23] *See: People v. Imbler* (1962), 57 Cal. 2d 711, 371 Pac. 2d 304, 21 Cal. Rptr. 568.

[24] *See: State v. Stewart* (1972), 56 Wis. 2d 278, 201 N. W. 2d 754.

clear that, during the same forty or fifty years, polygraph tests have moved from the "twilight zone" of *Frye* to such degree of standing and scientific recognition that unconditional rejection of expert testimony based on polygraph testing is no longer indicated.

*Conditions for admission.* Withdrawing an unconditional rejection of polygraph evidence does not necessarily mean that polygraph evidence is to have an unconditioned admissibility. We note that those state courts that have admitted polygraph evidence in criminal cases have done so (1) only for impeachment or corroboration, on the question of credibility; (2) where there is a stipulation of prosecutor and defense counsel, and consent of the party involved, to the taking of the test and the admissibility of its results; and (3) with the trial court retaining the right to reject the proffered testimony if not convinced that the examiner is qualified and that the test was conducted under proper conditions.[25] Of the state courts that have provided for the admission of polygraph evidence under certain conditions, we are most impressed with the conditions for admission of polygraph evidence adopted by the Arizona Supreme Court in the *Valdez Case.*[26] We accept and adopt the *Valdez* conditions. Henceforth, in Wisconsin, expert opinion evidence as to polygraph tests [27] may be admitted in a criminal case subject to the following conditions.

[25] *See: State v. McDavitt* (1972), 62 N. J. 36, 297 Atl. 2d 849; *State v. Fields* (Mo. 1968), 434 S. W. 2d 507; *State v. Freeland* (1964), 255 Iowa 1334, 125 N. W. 2d 825; *State v. Ross* (1972), 7 Wash. App. 62, 497 Pac. 2d 1343; *People v. Davis* (1969), 270 Cal. App. 2d 841, 76 Cal. Rptr. 242; *State v. Brown* (Fla. App. 1965), 177 So. 2d 532; and *State v. Valdez* (1962), 91 Ariz. 274, 371 Pac. 2d 894 (en banc). *See also:* Annot. (1973), 53 A. L. R. 3d 1005.

[26] *State v. Valdez, supra,* footnote 25, at pages 283, 284.

[27] Defining polygraph tests, in *State v. Valdez, supra,* footnote 25, at pages 276, 277, the Arizona Supreme Court stated: "The polygraph or lie-detector is a pneumatically operated device which simultaneously records changes in a subject's blood pressure, pulse,

*As to polygraph tests taken by the defendant* and expert testimony related thereto, polygraph testimony is admissible in this state, as in Arizona under *Valdez*, ". . . to corroborate other evidence of a defendant's participation in the crime charged," and, "If he takes the stand such evidence is admissible to corroborate or impeach his own testimony." [28] The required preconditions or qualifications for the admission of such testimony, in this state as in Arizona under *Valdez*, are as follows:

(1) That the district attorney, defendant and his counsel all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs, and the examiner's opinion thereon on behalf of either defendant or the state.[29]

(2) That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial court, *i.e.*, if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.[30]

(3) That if the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

---

respiration rate and depth, psychogalvanic skin reflex (skin resistance to electrical current) and, in some cases, muscular activity. 'The basis for the use of the so-called lie-detector . . . is the hypothesis that conscious deception can be deduced from certain involuntary physiological responses in the same manner as physicians diagnose various diseases. The thesis is that lying engenders emotional disturbances which are transmuted into tangible bodily manifestations.' [Quoting Kleinfeld, *The Detection of Deception— A Résumé*, 8 Fed. B. J. (1947) 153, 157.] The machine itself reflects and records only the subject's physiological responses to the questions propounded by the operator. He then interprets the *polygraph* (meaning, literally, 'many pictures') and determines whether the subject is lying."

[28] *Id.* at page 283.
[29] *Id.* at page 283.
[30] *Id.* at page 283.

(a) the examiner's qualifications and training;

(b) the conditions under which the test was administered;

(c) the limitations of and possibilities for error in the technique of polygraphic interrogation; and

(d) at the discretion of the trial court, any other matters deemed pertinent to the inquiry.[31]

(4) That if such evidence is admitted the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate whether at the time of the examination defendant was telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given.[32]

*As to polygraph tests taken by a complaining or principal witness,* as in the case before us, or any other witness in a criminal case, the graphs and expert testimony related thereto are admissible, on the issue of credibility, for corroborative or impeachment purposes, only if the same four qualifications are met: (1) Written stipulation of prosecutor, defense counsel and person taking the test as above required; (2) admission of testimony discretionary with trial court as above provided; (3) opposing party to have right to cross-examine as above noted; and (4) jury to be instructed as provided above.[33] We find no reason or merit for establishing one set of qualifications for admissibility of polygraph testing of a defendant, and another for admissibility of the polygraph testing of a state witness. The required four qualifications for admissibility are, in this state, to be the same for both situations.

*Applicability to present case.* In the case before us, the defendant took two polygraph tests, one given by a

[31] *Id.* at page 283.
[32] *Id.* at pages 283, 284.
[33] *Id.* at page 283.

sheriff's lieutenant and experienced polygraph examiner of Green Bay, and one given by a police sergeant and experienced polygraph examiner of Wausau. The offer of proof was their testimony as expert examiners that the defendant was truthful in his responses in denying any knowledge or participation in the crime allegedly committed. The complaining witness took two polygraph tests, both given by the same police sergeant of Wausau who had examined the defendant. The offer of proof was his testimony that the complaining witness was not telling the truth in her responses to questions, including her statement that defendant had sexual relations with her on the night of the rape. As to the one test of the defendant and two tests of the complaining witness given by the polygraph examiner of Wausau, the record discloses that the defendant's counsel gave notice to the district attorney that the defendant would submit to such examination by such examiner, and thereupon the district attorney after some discussion had the complaining witness voluntarily submit to polygraph testing by the same examiner.

What the record does not reveal or indicate is whether the testing of both defendant and complaining witness by the same examiner was part of an agreement or stipulation that the tests and the examiner's opinion thereon were to be admitted at trial. The gap is understandable with the *Bohner* decision blocking the way to such admissibility at the time the trial judge ruled on the offer of proof. We are not here referring to a written stipulation. That procedural safeguard is to be insisted upon in all future cases to avoid otherwise predictable disagreements and disputes as to whether and what the parties involved agreed to as to polygraph testing. Solely, in the case before us, because neither the parties nor the trial court could know the exact qualifying require-

ments for admissibility,[34] we would hold it a sufficient compliance with the first of the four qualifications required for the parties to have agreed that test results and expert opinion in regard thereto were to be admissible at time of trial. This would not, of itself, establish admissibility but would here constitute meeting the first of four requirements, in this case only. The record here gives no firm basis for finding either the presence or absence of such required advance stipulation or agreement of the parties. Reversal in the interest of justice in this case being required on other grounds, we include a direction to the trial court to conduct a *Goodchild*-type hearing to determine whether the district attorney, defense attorney, defendant and complaining witness agreed not only to the taking of the respective tests but also the admissibility at time of trial of polygraph testimony in regard thereto.

*Interest of justice.*

*Failure to produce evidence.* While other issues are raised, we find reversal in the interest of justice here required by reason of the failure of the prosecution to produce significant evidence concerning the case and defendant's guilt. In the case of *Brady v. Maryland*,[35] the United States Supreme Court ruled: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to

[34] Here, in allowing inquiry into the existence of an unwritten stipulation, we adopt a procedure similar to that known as "sunbursting," in order to ". . . reward . . . a litigant who has persevered in attacking an unsound rule and as an avoidance of stating the new rule as purely prophetic dictum." T. E. Fairchild, *Limitation of New Judge-Made Law to Prospective Effect Only: "Prospective Overruling" or "Sunbursting,"* 51 Marq. L. Rev. (1967–1968), 254, 256.

[35] (1963), 373 U. S. 83, 83 Sup. Ct. 1194, 10 L. Ed. 2d 215.

punishment, irrespective of the good faith or bad faith of the prosecution." [36] Good faith or bad faith are not involved or imputed to anyone in our finding that evidence to which the defendant should have had access was denied or delayed by developments before and during the trial. One such denial of fair play resulted from the prosecution's furnishing the defendant with an inaccurate copy of complainant's statement given earlier to the police. The prosecution stipulated that the copy it furnished was a true and accurate copy. Later in the course of the trial the defense counsel found inconsistencies between the statement and testimony given. It developed that the statement furnished was neither accurate nor complete. The prosecution sought to explain the inaccuracies or inconsistencies discovered, terming them "typographical errors." The first statement, inaccurate and incomplete, consisted of eight pages. The second and correct statement consisted of 11 pages. Typographical errors would hardly account for three entire pages of typewritten copy being omitted. The pages omitted contained statements unfavorable to the case of the prosecution. We do not see this furnishing of an inaccurate statement as cured, at least not completely so, by the furnishing much later in the trial of an accurate and complete statement.

The need for full and fair disclosure of evidence is, this court has stated, " '. . . especially apparent with respect to scientific proof and the testimony of experts. . . .' " [37] The conclusion cannot be avoided that evidence of this type in this case, in the possession of police and prosecution, was not disclosed even though

---

[36] *Id.* at page 87.

[37] *Wold v. State* (1973), 57 Wis. 2d 344, 351, 204 N. W. 2d 482, quoting with approval American Bar Association, Project on Standards for Criminal Justice, *Standards Relating to Discovery and Procedure Before Trial* (Approved Draft), Commentary at page 66.

demand was made, or disclosed only by expert testimony at the time of trial. The prosecution failed to produce any reports as to fingerprints taken from the handlebars of complainant's bicycle after the alleged rape. It appears undisputed that they were determined to be not the fingerprints of the defendant, but the reports of the fingerprint identification tests were not produced. The state contends that this is a matter of no importance because there was no testimony that the defendant had touched the bicycle. However, the record reveals that the complainant testified that the defendant grabbed the bicycle with his right hand, and it may be inferred that the failure to produce the fingerprint test reports was because such reports were exculpatory with regard to the guilt of the defendant. The failure to produce this fact and report as to fingerprints on the complainant's bicycle at least indicates " '. . . as the most natural inference, that the party fears to do so, and this fear is some evidence that the circumstances or document or witness, if brought, would have exposed facts unfavorable to the party. . . .' " [38]

A third area of withheld or belatedly revealed evidence relates to pubic hairs found on the body or on the clothing worn by the complainant on the night of the alleged rape. The record establishes that defense counsel had been assured that all crime laboratory reports had been furnished to him by the district attorney, and the motion of defense before trial was for notice and production of all physical evidence that the state intended to use, which motion was granted. The testimony of the representative of the state crime laboratory was that tests of pubic hairs found on white mittens worn by the complainant on

---

[38] *See: Coney v. Milwaukee & Suburban Transport Corp.* (1959), 8 Wis. 2d 520, 527, 99 N. W. 2d 713, citing and quoting 2 Wigmore, *Evidence* (3d ed.), p. 162, sec. 285; *Schemenauer v. Travelers Indemnity Co.* (1967), 34 Wis. 2d 299, 309, 149 N. W. 2d 644, also citing Wigmore.

the night of the alleged rape incident indicated that they were not hers, not those of her boyfriend and not those of the defendant. Testimony of the same expert witness revealed that tests conducted by the state crime laboratory of five pubic hairs found in the genital area of complainant's body revealed that they were not hers, not those of her boyfriend and not those of the defendant. This was certainly evidence exculpatory in nature. The defendant's counsel complains that it was "only by accident" that he was able to learn of these highly significant scientific tests, and we agree that there was a duty to produce them in response to the defense motion for disclosure that was granted by the trial court.

As to defense objections to the lineups conducted, at the second of which the complainant identified the defendant, we find no impropriety in the manner in which they were conducted. As to the claim that the account of events as given by the complaining witness being "inherently incredible," while there was no evidence of bruises, cuts or marks of violence from the one or two-hour ordeal, we find only a question of credibility for the jury, as trier of fact, to resolve. As to the trial court's exclusion of evidence as to prior sexual conduct of complainant, it was within the discretion of the trial court to exclude evidence where "its probative value is outweighed by possible jury prejudice." [39] Since the judg-

---

[39] *Miller v. State* (1972), 53 Wis. 2d 358, 368, 192 N. W. 2d 921, citing *Whitty v. State* (1967), 34 Wis. 2d 278, 149 N. W. 2d 557, wherein this court adopted Rule 303 of the American Law Institute Model Code of Evidence, reading in part:

" '(1) The judge may in his discretion exclude evidence if he finds that its probative value is outweighed by the risk that its admission will

" ' . . .

" '(b) create substantial danger of undue prejudice or of confusing the issues or of misleading the jury, . . .' "

ment is being reversed in the interest of justice, we note that such upholding of the trial court ruling is not to extend to statements made by complainant concerning an argument with her boyfriend on the night of the alleged rape about going on the pill or conduct connected thereto or so related in time as to be properly considered a part of the *res gestae.* As to acts of this complainant or any other removed in time and place from the occasion of an alleged rape, we would not require a trial court to put a complainant on trial as to sexual episodes in her past life. It is the defendant in a rape case, not the complainant, who is to be placed on trial.[40] However, in this case, in such trial of this defendant, we find from the record that reversal, pursuant to sec. 251.09, Stats., in the interest of justice is required.

*By the Court.*—Judgment reversed, with directions.

---

[40] *Madison v. State* (1973), 61 Wis. 2d 333, 337, 212 N. W. 2d 150.