STATE, Respondent, v. SPRAGGIN, Appellant.

*No. State 207 (1974). Argued February 3, 1976.—Decided March 2, 1976.*
(Also reported in 239 N. W. 2d 297.)

608

For the appellant there was a brief by *Robert J. Ruth* and *Noll, Donovan, Bolgrien & Ruth* of Beloit, and oral argument by *Robert J. Ruth.*

For the respondent the cause was argued by *Michael R. Klos,* assistant attorney general, with whom on the brief were *Bronson C. La Follette,* attorney general, and *James H. McDermott,* assistant attorney general.

HANLEY, J. The following issues are presented on appeal:

1. Was it error to admit the Zenith television and .38 caliber revolver into evidence because they were the fruits of illegal search and seizure activity?

2. Were the two items properly consolidated into one count of receiving stolen property?

3. Was it error for the trial court to admit evidence of certain other items of property found in the defendant's residence?

4. Did the trial court err in admitting evidence of the retail price of allegedly stolen goods?

5. Was the intended impeachment of the defendant through evidence of other criminal activity with which she had been charged properly allowed?

6. Was the defendant's due process right to a fair trial compromised by certain newspaper articles?

7. Were the deliberations of the jury made under circumstances that violated the defendant's due process right to a fair trial?

*Search and seizure.*

On the first day of trial, counsel for defendant moved to suppress the Zenith television and .38 caliber revolver from admission into evidence. The trial court ruled that these items were not the product of a search, were in "plain view" of the officers, and were reasonably seized and held by the police.

Evidence derived from constitutionally improper acts is not to be introduced against a defendant. *Michigan v. Tucker* (1974), 417 U. S. 433, 445, 94 Sup. Ct. 2357, 41 L. Ed. 2d 182. The initial question here does not involve a search as such. The Zenith television sought to be suppressed was undisputedly in plain view. Additionally, the use of a flashlight to illuminate the garage did not render the finding of the revolver as other than a plain view discovery. *Warrix v. State* (1971), 50 Wis. 2d 368, 374, 184 N. W. 2d 189. There is no search involved in a plain view and the question of the validity of the discovery is based on the right of the officer to be in a place where the inadvertent view occurs. *State v. Gums* (1975), 69 Wis. 2d 513, 517, 518, 230 N. W. 2d 813.

The officers were present to execute the arrest warrant of Eddie Blakely. Testimony from one officer included

a statement that he was told that Blakely was to be arrested for possession of heroin, which had been purchased from him by a state agent at the Spraggin residence. The officers had been warned that Blakely had been armed.

The existence of an arrest warrant here is not disputed. Defendant has not sought to attack its validity. No specific allegation challenging it was even made, and counsel for the defendant even objected to the materiality of testimony concerning the basis for the warrant and instructions given the officers regarding its subject. The validity of the warrant thus remains unchallenged.

The state assumed the initial burden here and the court ruled against suppression. Defendant complains that she neither gave her consent to a search of the premises nor was served with a search warrant, apparently referring to the room and closet survey of the house specifically made only to find Blakely. She signed a consent form prior to the thorough, itemized search conducted later. Thus, in challenging the officers' right to be in a position where the items were viewed, the defendant refers to the manner of execution of the arrest warrant.

The law enforcement agents here possessed an arrest warrant. In *State v. Gums, supra,* the defendant challenged the unconsented entry of a police officer through the unlocked dwelling entrance. The officer was attempting to execute a probation violation warrant, an empowering document not distinguishable from an arrest warrant. *Id.* at 519. He approached the dwelling of the probation absconder, identified himself and inquired if the violator was present. The door was closed, a voice called out " '. . . yes, he's upstairs,' " and the sounds of rapid movement were heard. When the officer ordered the door to be opened, one occupant informed him that it was unlocked and that they were "waiting for him to come down" from upstairs. This court stated that the officer had the right to thereupon enter the house be-

cause he possessed a warrant and there existed circumstances yielding probable cause to believe that the suspect was within and yielding a reason to believe in the existence of an exigent situation, *i.e.*, an attempted escape. *Fisher v. Volz* (3d Cir. 1974), 496 Fed. 2d 333, 341, 342, was approvingly quoted for the rule:

" 'We therefore hold that police officers may not constitutionally enter the home of an innocent citizen in search of a suspected offender for whom they have a valid arrest warrant, even under exigent circumstances, unless they also have probable cause to believe that the suspect will be found on the premises.' "

It is undisputed that Blakely resided at the residence and this fact was known by the officers.

In executing the arrest warrant, the officers may investigate an entire dwelling in order to make sure that the wanted person is in fact present or absent, or that no other parties could present a danger to them. *State v. O'Brien* (1975), 70 Wis. 2d 414, 422, 423, 234 N. W. 2d 362. The incidental investigation of the garage and its occupant and the seizure of the loaded weapon were reasonable acts undertaken pursuant to such authority.

The police officer who found the .38 caliber revolver testified that he had been warned that Blakely may be armed. State agents had informed the police of a purchase of heroin from him, apparently at this dwelling where he was known to reside. The view of the television, undisputedly in open view, was likewise obtained in the survey of the house undertaken to find Blakely.

We think the trial court's finding that the 25″ Zenith television set and the .38 caliber revolver were not the product of a search and were discovered in "plain view" by the police is fully justified by the evidence adduced at the suppression hearing.

*Consolidation of charges.*

Mrs. Spraggin had originally been charged with two separate felony counts of receiving stolen property. On the day of trial, the state moved to consolidate the charges into one felony count. The trial court concurred, over defense objections, based on the state's promise that testimony would be adduced ". . . that the items in question were both received by the defendant at the same time."

At the trial Officer Farmer testified that the defendant told him at the time of her arrest that she purchased the revolver, television set and other items from Morris Percy for the price of $225. Mrs. Spraggin testified that she had a series of transactions with Percy. Although the exact time and sequence of the reception of the revolver in relation to two rifles (.22 caliber and .30–06) also received from Percy were muddled by cross-examination, it was clear that the television set was received separately and after the guns and that she had separately bargained with Percy for a price of $100 on it. When the set was delivered, Mrs. Spraggin testified that she gave him $225 in cash. She explained that this was in settlement for the television and the amount owed on the guns.

A leading case on the receipt of multiple stolen articles, *Hamilton v. State* (1937), 129 Fla. 219, 176 So. 89, 92, 112 A. L. R. 1013, 1017, held:

"Receiving or concealing different articles of stolen property at different times and on separate and unconnected occasions, constitute separate offenses and cannot be prosecuted as one crime, in one count, though all of the property is afterwards found in the possession of the defendant at the same time and place. (*Smith v. State,* 59 Ohio St. 350, 52 N. E. 826.)"

Authorities in the field of criminal law accept this proposition. 2 Wharton, *Criminal Law and Procedure,* p. 288, sec. 569 (1957).

An exception, noted in some older cases, is that receptions of numerous articles in separate and distinct transactions but in pursuance of a conspiracy between the thief and the receiver can be called one offense and the property value aggregated to reach felony levels. *Peters v. State* (1921), 191 Ind. 130, 132 N. E. 256.

Sec. 943.34, Stats., enables the prosecution of those who receive or conceal stolen property. "Conceal" undoubtedly is not limited to a literal meaning and embraces those who render the discovery of the stolen items more difficult without their having been the thief or recipient of the property. The disjunctive "or" in the statute would indicate as much.

The other criminal act defined in the statute is the reception of stolen property. It is implicit that the act of receiving stolen property, irrespective of the number of items so received, defines a completed crime. Separate receptions are separate crimes. The value of goods received in one reception are thereafter accumulated to determine the grade of the offense.

A rule that would allow the value of items received as separate offenses to be aggregated for one offense, on the basis of conspiracy, is anomalous. Our modern "party to a crime" statute, sec. 939.05 (2) (c), Stats., more justly makes the conspirator "fence" a punishable party to the theft. A conspiracy of successful nickle-and-dime shoplifters still are criminally responsible for only multiple misdemeanors, not felony theft. Thus, when the reception of stolen items occurs on separate occasions, the ends of justice and the form of the defined crime are met by multiple misdemeanor counts, not by the forbidden joinder of separate crimes in one count for an aggregate felony value. Sec. 971.12 (1).

In arguing a conspiracy here, the state stresses that a mutually agreed price had not been established for the previously delivered guns when the television was delivered and that the settling of accounts at that time by the cash payment composed one "transaction" for a single felony offense. Besides failing to establish a preexisting conspiracy or even that Percy was in fact the thief, this argument ignores the element of reception as the determining point of crime. The crime of receiving stolen property does not require payment, and the factor of aggregate payment is insufficient to establish the necessary conspiracy allowing value aggregation even under that outmoded theory.

It is clear that the prosecutor made certain unwarranted assumptions that were properly jury questions. The initial information charged separate felony counts of receiving stolen items each valued in excess of $100. The preliminary examination apparently disclosed that the revolver, originally purchased at slightly over $100, had a fair market cash value of $80. Defense counsel objected that the state was attempting to combine two possible misdemeanors to achieve felony value. The state, assuming that a single transaction had conclusively occurred, replied that the television obviously exceeded felony value and that the state was properly reducing the two possible felony (or felony and misdemeanor) counts into one because of the single transaction. The trial court could see no prejudice to the defense under the circumstances. Thus the trial court committed no error in accepting the amendment but erred in allowing the court to proceed when the proof offered substantial variation from the allegation.

This is also true because the acceptance of the prosecutor's representation as to property value was in effect a decision on the grade of the offense, which is clearly an issue only for the jury. *Heyroth v. State* (1957), 275

Wis. 104, 109, 81 N. W. 2d 56. The only proof on the market value of the revolver established it at $80. Mrs. Spraggin testified to buying the television for $100. The jury returned a finding of aggregate value for the two items of $180. Defendant received a felony sentence for what clearly appears to be two misdemeanors.

The state finally argues that Spraggin cannot rely on this error because she failed to state it to the trial court with particularity either before, during, or at the close of trial. However, counsel did perceive that prejudicial error was being committed by the assumptions of the prosecutor, particularly on the fact of whether felony value was conclusively established. The state's theory of one transaction also was not apparent until after the testimony was received and the argument concluded. In *State v. Schneidewind* (1970), 47 Wis. 2d 110, 120, 176 N. W. 2d 303, this court stated:

"Thus this court will not normally review questions not properly raised and preserved in the trial court. We may exercise our discretion in the interest of justice and may do so where errors are patently prejudicial or of constitutional dimensions."

Stated in the context of a failure to allege insufficiency of the evidence before the trial court, this admonition on failures to properly preserve error certainly does not bar review of the severely prejudicial error of a felony conviction for two misdemeanors.

Since variances between the allegations and the proof may be beyond the control of the state, *see: People v. Smith* (1945), 26 Cal. 2d 854, 161 Pac. 2d 941; *State v. Niehuser* (Or. App. 1975), 533 Pac. 2d 834; *People v. Roberts* (1960), 182 Cal. App. 2d 431, 6 Cal. Rptr. 161, one option is to charge in the alternative. Likewise, the defense could request, or the state on its own, could submit the alternative charges of a single or multiple receptions, when, as in cases of lesser included

charges, *see: Devroy v. State* (1942), 239 Wis. 466, 1 N. W. 2d 875; *State v. Melvin* (1970), 49 Wis. 2d 246, 181 N. W. 2d 490, a reasonable view of the evidence reveals that there is a reasonable basis for conviction on either. With the alternatives phrased in terms of separate or joint receptions of multiple stolen items, the jury may decide on the evidence and thereafter grade the offense through the establishment of value.

*Prejudicial evidence.*

Error is asserted for the admission into evidence, over objection, of certain items prejudicial to the defendant which lacked sufficient probative value to relevant issues, as proscribed by sec. 904.03, Stats. and proposed by *Whitty v. State* (1967), 34 Wis. 2d 278, 149 N. W. 2d 557.

A witness for the state testified that the following items were found upon a search of defendant's home: the Zenith television, a Sony clock-radio, a sawed-off shotgun found in a closet, a long barrel revolver found in a storage trunk in a bedroom, a short barrel revolver found between the mattress and springs of a bed, a derringer found in another bed, two rifles (.22 and .30–06) found in a bedroom closet, four other radios, a stereo system, cassette player, electric razor, and a stereo built into one of four other televisions. One of the sets was identified as property taken in a July, 1974 burglary of the Mark Robson residence.

Leonard Byrd testified to a burglary of his residence in April, 1974. He identified the Zenith television and the Sony clock-radio as his own. In addition Byrd mentioned other items taken from his home.

Gregory Hannett identified the .38 caliber revolver taken in the July burglary of his residence. Robson testified that the television set taken from him had been identified and returned to him.

Since one of the officers had heard defendant state that she had paid $225 for the Zenith television and certain other items, these items were introduced into evidence and testimony adduced as to their fair market value. The obvious purpose was to establish a gap between the price defendant paid and the actual market value of the goods, such that it could be inferred that she knew the property was stolen. The .22 caliber rifle, .30–06 rifle and Sony clock-radio were thus properly produced, in addition to the specifically charged items. Spraggin here chose to demonstrate that the estimates of market value were inflated or based on mistaken assumptions as to the quality of the items, arguing that a fair price refuting guilty knowledge was in fact paid.

The state justifies the testimony as to other televisions and weapons found in the defendant's household as probative of the intent of the defendant in receiving the stolen items. The circumstances under which property is received may be indicative of the knowledge or purpose of the recipient. A prosecution for receiving stolen property places the burden of proof on the state to establish intent and knowledge of the stolen character of the goods. Secs. 943.34 and 939.23 (3), Stats. The mental element may be established with the aid of circumstantial and inferential evidence. *United States v. Lambert* (7th Cir. 1972), 463 Fed. 2d 552; *Oosterwyk v. State* (1943), 242 Wis. 398, 8 N. W. 2d 346. *See: Organ v. State* (1974), 65 Wis. 2d 36, 221 N. W. 2d 823. A trier of fact may infer from the presence of many similar articles that the recipient of property is engaged in the practice of selling stolen goods. One other television was in fact proven as stolen.

Certainly explanations could be made that show the harmless nature of such multiple possessions, and the trier of fact may reach such inferences on its own. The

possession of numerous televisions and guns may be due to entirely innocent reasons and cause no suspicions as to further acquisitions, but the existence of such rationale is a matter of defense evidence and argument as it arouses no emotional reaction that forecloses reasonable explanation.

Spraggin in fact undertook to demonstrate that, besides the Zenith, one television belonged to her mother and one to Blakely, who got it from Percy and who kept it in the bedroom she rented to him. She testified that she purchased the Zenith rather than use the small television of her mother, who lived with her. As for the guns, she purchased the rifles because she hunted in Mississippi when she grew up and wanted to start hunting again. She also stated she bought the .38 caliber revolver for personal protection, in addition to her derringer. The revolver in the bed and sawed-off shotgun were in Blakely's room and she testified to knowing nothing about them. The revolver in the trunk belonged to her brother-in-law. For impeachment purposes, the state adduced that she had not gone hunting in this state although she resided here for almost twelve years. The trier of fact could thus accept her version or disregard it in adjudging the fact of intent and knowledge. The defense was also free to show the nature and use of the various appliances to rebut any inference created by their number that they were in fact stolen goods. Their admission into evidence, however, was proper.

The only unfair prejudice that could have arisen was from the testimony of the burglary victims of certain items stolen from their residences, which items were definitely not involved here. Since these items, namely, televisions and guns, were irrelevant to this case and may have led to the inference that they were among the other items found in the Spraggin house, the testimony on them should have been excluded.

*Retail price.*

"Value" of stolen property in the context of theft is defined as

". . . the market value at the time of the theft or the cost to the victim of replacing the property within a reasonable time after the theft, whichever is less. . . ." Sec. 943.20 (2) (c), Stats.

This statutory standard is explicitly applicable only to theft. The jury here was instructed that they should find value, as required by *Heyroth, supra,* but value was defined by the theft statute measure. Value in the context of receiving stolen property is usually considered to mean "fair market value" at the time of reception. *People v. Hansen* (1963), 28 Ill. 2d 322, 192 N. E. 2d 359. Market or replacement value at the point of theft is certainly relevant for grading that offense. The criminal reception of stolen goods may occur at a time far removed from the original taking, however, and they may be in a substantially changed condition. Their market value in the general time period of reception is the proper test for evaluating the offense. *See: United States v. Evans* (8th Cir. 1971), 446 Fed. 2d 998, 1001, certiorari denied (1972), 404 U. S. 1021, 92 Sup. Ct. 695, 30 L. Ed. 2d 670. If there is no testimony or testimony that is subject to question as to credibility on the time of reception, the jury certainly may infer that the goods had a value equivalent to their value at the time of taking.

Original retail cost of the items would be relevant to this determination. Market value is not always precisely determinable, and the trier of fact should be allowed to hear all factors that would be considered in the market to evaluate property, including its original price. Experts' testimony on market value may be received from those who customarily deal in items of the

type alleged as stolen, and their testimony may be prefaced on the factors that have modified an item's price from original value. Counsel may attack such evaluations and call attention to the fact that original cost may not necessarily be equatable with the appropriate market figure for the period when the goods are charged as received.

*Impeachment testimony.*

To set the stage for the introduction of the stolen items found in the defendant's home, the district attorney produced testimony describing the predawn attempt to arrest Blakely at the residence. One officer testified to the discovery of defendant in the garage and of his entrance into the garage and discovery of the .38 caliber revolver.

On direct examination, Spraggin stated that she was in the garage at that time but did not know how the .38 caliber revolver got there; she had seen Blakely with it a few days earlier. The following colloquy then occurred:

"*Q.* What were you doing out there that morning when the police came?
"*A.* I had been up all night.
"*Q.* Why is that?
"*A.* My heart runs and I couldn't get rest with it running so I had been up and when I heard somebody come down my driveway, ran against the car, seemed like they hit the drainpipe."

Cross-examination also raised the subject:

"*Q.* How did you happen to be awake?
"*A.* I'd been off sick since the 16th of August with my heart keeping me awake at night running and I had not been to sleep.
"*Q.* And the reason—the sole reason that you hadn't been asleep all evening was the fact that your heart was bothering you?

"*A.* Right.

"*Q.* Isn't it a fact Mrs. Spraggin that the reason you were awake was because during the early morning hours of that day, you had been arranging for an $800 sale of heroin buy with Agent Wells of the Department of Justice?

"*A.* No."

Objection was raised as to the prejudicial inference of other criminal activity unrelated to the charge of receiving stolen property. The district attorney stated that he was attempting to impeach the credibility of the defendant on this point. He promised to subpoena Wells, who would "testify during the early morning hours that she claims she was up with a heart problem, she was on the phone some three or four hours with Agent Wells for arranging a heroin buy." The court allowed the district attorney to proceed.

On appeal, the defendant objects to the prejudicial effect of this contradiction on the collateral issue of drugs.

A rule has evolved that prohibits contradiction, more commonly generalized as impeachment, of fact testimony that is collateral to the issues of the particular case. McCormick, *Evidence,* at p. 98, sec. 217 (2d ed. 1972) ; 3A Wigmore, *Evidence,* secs. 1001, 1002 (Chadbourn, rev. 1970). Cross-examination on such matters is to be limited, and it has been said that the examiner must abide by the answers to his questions on immaterial subjects. 4 Jones, *Evidence,* sec. 25.8 (6th ed. 1972). *See: Greene v. Agnew* (1915), 160 Wis. 224, 227, 151 N. W. 268. The imprecision of conclusions that can be drawn from a contradiction on immaterial matters, when obviously only the impeaching effect is involved, is the logical basis for the bar. Auxiliary policy reasons include distraction and confusion of unprobative issues for the trier of fact, the prejudice and surprise to the proponents of the contradicted witness when his

testimony on collateral matters is challenged, *Wigmore,*
*supra,* and perhaps even the unwarranted impression
created of the contradicted witness who may be able but
unprepared to explain or refute the contradiction of
immaterial facts. These reasons are of course not ap-
plicable when the testimony is on a material issue, so
much depends on the determination of what is "col-
lateral."

The issues in the case define topics as material or
collateral. *Tobar v. State* (1966), 32 Wis. 2d 398, 405,
145 N. W. 2d 782, certiorari denied 390 U. S. 960, 88
Sup. Ct. 1059, 19 L. Ed. 2d 1157. Wigmore suggests that
a matter is collateral if it does not meet the following
test:

"Could the fact, as to which error is predicated, have
been shown in evidence for any purpose independently
of the contradiction?" *Wigmore, supra,* at sec. 1003.

Facts "relevant to an issue" in the case and facts "rele-
vant to the discrediting of a witness" are seen as meeting
the test. *Id.* at secs. 1004, 1005. The latter category
is defined as those facts which would be otherwise
receivable as bearing on the witness' testimonial quali-
ties, such as bias, moral character, mental and observa-
tional abilities and skill. This court has implicitly indi-
cated that the trial court has discretion in determining
whether matter is collateral, *Tobar, supra,* and that
the trial court may allow questioning of witnesses' ability
to remember collateral facts immaterial to the issue,
*Marks v. State* (1974), 63 Wis. 2d 769, 779, 218 N. W. 2d
328. Contradiction to discredit testimony should be
allowed only on material points, however, *Warrix, supra,*
at 377.

Against the strong case law forbidding impeachment
of collateral fact testimony, the state calls attention
to an exception where the witness brings up the col-
lateral matter on direct examination. Contradiction of

collateral matters elicited in direct examination may be allowed under restricted circumstances in the discretion of the trial court. *See: State v. Buss* (1956), 273 Wis. 134, 76 N. W. 2d 541; *Miller v. State* (1972), 53 Wis. 2d 358, 192 N. W. 2d 921; *see also, Schmit v. Sekach* (1966), 29 Wis. 2d 281, 139 N. W. 2d 88. The attempt at contradiction should have been prevented here.

No dispute exists that the fact sought to be established was collateral to the charge of receiving stolen property. It was not closely related to the material issues or to veracity on them. The state sought to controvert the alleged fact that Mrs. Spraggin was awake at the time of the warrant execution because her heart problem kept her awake at night, offering to present testimony that she was awake because she was occupied in a heroin delivery. Obviously this fact is immaterial to the charge here. Likewise, there is no blanket admissibility of character evidence, sec. 904.04 (1), Stats., and no conceivable alternative admissibility for the fact, secs. 904.04 (2) and 906.08 (2); *Kwosek v. State* (1973), 60 Wis. 2d 276, 281, 208 N. W. 2d 308. The only value to the state in introducing its version of the "collateral fact" was to derive the effect of impeachment of the defendant, calling the veracity of her other testimony in question, and its admission is thus not independent of the contradiction.

Counsel for Spraggin argues that the asserted contradictory matter was not exclusive of her version. The general rule is that the matter must directly contradict the previous assertions, 98 C. J. S., *Witnesses,* sec. 639, or at least inferentially render their mutual existence impossible or unlikely. The contradicting impression was perhaps created by the initial promise to show a conversation of "three or four hours" from approximately 12:30 a.m. on September 5th, which would logically consume the time almost to the point of the warrant execution. The offer of proof with the state agent

accounted for only an hour, from approximately 1:00 to 2:00 a.m., of conversation with a black female named Martha. The court declared no sufficient "tie up" until a local officer testified to the defendant's account of a similar conversation on the evening of September 4th. Since it is only the imprecise statement on direct testimony that is cited as the justification for relaxing the usual bar on contradiction of this highly collateral topic, the state was going too far afield and thus distracting from the issues by this attempt to introduce prejudicial matter only vaguely contrary to the direct examination.

Mrs. Spraggin's apprehension outside her home (she testified to being in pajamas, overcoat, and shoes) also was mentioned first by the state as a link to the stolen weapon and was only briefly touched upon by Spraggin to explain her presence in the garage. She never denied receiving the weapon. Lacking further direct testimony on the collateral details, the state was in no position to offer contradiction and the trial court abused its discretion in allowing further detailed questions to cure the defect. Even if the defendant's reference to "heart trouble" could be viewed as a bid for sympathy, the state could have attempted to contradict that medical fact, or more properly moved to strike that immaterial reference.

The state also argues that the defendant "waived" her objection by entering into the factual stipulation on the contradicting testimony. It is clear from the transcript that the stipulation only affirmed what the agent's testimony would have been on a subject, not that the testimony was factually correct. The waiver argument is inappropriate as based on a factual misconception of the stipulation.

*News articles.*

On November 7th, the second day of trial, the city newspaper published an article captioned "Robberies, burglaries on the rise," with the headline topping the

page except for a large photo of a hand pointing a revolver. The article mentioned the increase in those property crimes, stating that the city suffered from such occurrences more than any city of comparable size in the state. Court leniency and the need of drug addicts to finance drug purchases was cited as a factor in the property crime growth. It was mentioned that stolen property was often sold door to door. Police cautioned against purchasing "a $350 television set for $50." An interview with the police chief was noted to be published the following day.

The next day a front-page, outlined news article contained a summary of the interview with Beloit Police Chief Roger Helser titled "Criminals remain on streets: Helser." The article dwelt on deficiencies in the criminal justice system. Reference was also made to the role of drugs in the rising burglary and robbery rate:

"Officials estimate a typical heroin addict must have $70 a day to support his habit. Police say stolen goods are sometimes traded for drugs but it is more usual for the thief to try selling the merchandise to get money."

A reply from the courts was scheduled to be printed the next day.

That day was Saturday, November 9th, and the Spraggin trial had been held over till Monday. The front-page article, with a picture of the trial judge, contained the summary of interviews with him and the district attorney, in which the mechanics of the criminal justice system were explained. At the conclusion of the article, the judge was quoted:

"Burglary and robbery are not the problems of the courts or the police. They are problems of society . . . The moral code is shot full of holes. We are dealing with the amazing spread of the use of hard narcotics and this leads to the increase in property crimes."

When the trial resumed on Monday, counsel for Spraggin presented the articles and requested that:

"The court individually question each juror with respect to whether or not he or she read the article and if so whether the article in any way is going to influence them in the outcome of this case."

The court took judicial notice that the articles were published on the dates of the trial and that the newspaper circulation embraced the local area. He denied the motion to interview the jury because the articles did not discuss or refer to the defendant's case, publicity of which the jury had been instructed to disregard.

The state argues that the trial court properly exercised its discretion. The articles which appeared in the Beloit Daily News were of a purely informational nature, did not refer to the defendant's case in any manner, and were not the type of news articles that would reasonably be expected to create prejudice against this particular defendant or cause a juror to violate his oath of office.

The response of this court in *State v. Lambert* (1975), 68 Wis. 2d 523, 535, 536, 229 N. W. 2d 622, is dispositive of the present objection as well:

"In *Margoles,* the information was clearly prejudicial to the defendant, and the seventh circuit predicated its admonition on the *prejudicial* nature of the publicity. In the instant case, the story was not prejudicial to Lambert. During the trial of the case, the jury became aware, from the evidence, that the attorney general's office was investigating and prosecuting the chain distributor scheme which went by the name of Holiday Magic. Nothing in the news article brought facts to the attention of the jury that they did not already know from the testimony properly admitted into the record. The story was a straightforward news account.

"Under these circumstances, we conclude that the trial judge was not required to question the jurors; and where, as here, the story itself was not prejudicial, a

special admonition to the jury that only the facts before them were to be considered was more than sufficient to preserve the fairness of the trial and save it from the taint of any possible prejudice. Even that admonition was probably unnecessary." (Emphasis from original.) *Id.* at pages 535, 536.

The news articles in *Lambert* reported that the attorney general had announced a "crackdown" to curb illegal chain distribution. Lambert was on trial for such charge, and his firm was named in the article, which was released on the evening before the case went to the jury. The lack of prejudice in an informational news item was the key reason that the trial court was not required to take any corrective actions.

*Jury deliberations.*
The defendant argues that her constitutional guarantees, of a fair trial and the right of trial by an impartial jury, were impaired by the circumstances of the deliberations of the jury.

On the last day of trial, the jury had a noon meal. The arguments and instructions were later concluded and the jury retired for deliberations at 4:00 p.m. They returned at 8:30 p.m. to have brief, specific portions of testimony read. At 9:30 p.m. they returned for another brief item. The jury then returned at 11:15 p.m. and reported that they could not reach a unanimous verdict. In response, the court gave the standard instruction that included:

"I do not want you to understand by what I say that you are going to be made to agree, or that you are going to be kept out until you do agree."

At midnight, the court informed counsel that he would have the bailiff inquire as to whether the jury was making progress or was hopelessly deadlocked. Both counsel responded in the negative when asked for any

other comments or suggestions. The jury reported making progress. At 12:45 a.m. on November 12th, they returned a verdict of guilty.

Spraggin does not contend that the supplemental instruction was coercive. Defendant does assert that the jury was left with the impression that it would not be put up for the night, thereby leaving a potentially coercive impression that the jury would have to continue deliberating until it reached a verdict.

The supplemental instruction informed the jury that they would *not* be kept out until they agreed. From the record, it can be perceived that the jury was active in their deliberations, finally reporting their deadlock seven hours later. After the supplemental instruction, the court made proper inquiry of counsel to see if they had any suggestions about terminating deliberations for the evening. Neither counsel suggested then that the jury take a break for food, for example, or be summarily halted till morning. Such a course was also not pursued when the jury reported that it was "in progress." Spraggin tactically chose to await the jury's verdict, and should not complain about the unfavorable circumstances surrounding the deliberations when ample opportunity was afforded to move for corrective measures. Although the trial court probably should have afforded the jury the opportunity of dinner before the deliberations, it and counsel were in a position to observe the jury's disposition, which this court is not. Any circumstantial coercion was a product of the defendant's tacit acquiescence, not an abuse of the trial court's discretion.

*By the Court.*—Judgment reversed; cause remanded for a new trial not inconsistent with this opinion.