TURNER, Plaintiff in error, v. STATE, Defendant in error.†

*No. 75–724–CR.  Argued January 6, 1977.—*
*Decided February 15, 1977.*
(Also reported in 250 N. W. 2d 706.)

† Motion for rehearing denied, without costs, on March 29, 1977.

4

6

8

For the plaintiff in error the cause was argued by *Richard M. Sals,* assistant state public defender, with whom on the briefs were *Howard B. Eisenberg,* state public defender, and *Steven Weiss,* of counsel, of Madison.

For the defendant in error the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

HANLEY, J.  Seven issues are presented for review:

1.  Was the evidence sufficient to establish the defendant's conduct was imminently dangerous and thus to sustain a conviction of second-degree murder?

2.  Was the evidence sufficient to sustain a conviction of enticing a child for immoral purposes?

3.  Should a new trial have been granted because a statement that the defendant had been involved in a prior sex crime was uttered before the jury?

4.  Should the defendant's confession have been suppressed because it was involuntary?

5.  Was it reversible error for the trial court to exclude all reference to the August 2, 1974, polygraph examination and to the polygraph examination that was to be taken on August 8, 1974?

6.  Did the trial court abuse its discretion in denying defendant's motion for a change of venue?

7.  Should a new trial be granted in the interest of justice?

*Imminently Dangerous Conduct*

The defendant contends the evidence adduced at trial is not sufficient to support the conviction upon the charge of second-degree murder. The crime of second-degree murder under sec. 904.02, Stats., contains three

10

elements: (1) the accused's conduct was imminently dangerous to another, (2) the accused's conduct was of such a character that it evinced a depraved mind, regardless of life, and (3) the accused's conduct, imminently dangerous to another and evincing a depraved mind, regardless of life, caused the death of the victim. Wis. J.I.—Criminal, Part II, sec. 1110; *Wangerin v. State,* 73 Wis.2d 427, 243 N.W.2d 448 (1976); *Seidler v. State,* 64 Wis.2d 456, 219 N.W.2d 320 (1974). The defendant only challenges the sufficiency of the proof as to the first element, that the conduct was imminently dangerous.

The state in a criminal case is obligated to prove every essential fact of the crime charged beyond a reasonable doubt. The test which this court applies to determine whether the state has met this burden was explicitly stated in *Bautista v. State,* 53 Wis.2d 218, 223, 191 N.W.2d 725, 727–28 (1971):

"The test is not whether this court or any of the members thereof are convinced beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true. . . . The credibility of the witnesses and the weight of the evidence is for the trier of fact. In reviewing the evidence to challenge a finding of fact, we view the evidence in the light most favorable to the finding. Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be adopted."

It is the defendant's contention that the state failed to show a sufficient probability or likelihood that death would result from the conduct of the defendant, and thus, that conduct could not be found to be imminently dangerous beyond a reasonable doubt.

In *Seidler v. State, supra* at 462, 219 N.W.2d at 324, this court recognized the statements of Mr. Chief Justice RYAN in *Hogan v. State,* 36 Wis. 226 (1874), as setting forth the accepted definition of "imminently dangerous" conduct:

" 'The first condition of the statute is, that the act producing death shall be imminently dangerous to others. It has been said that every act producing death must be thus dangerous. Perhaps this is literally true. But the statute does not go on fortuitous or latent danger, but on essential and apparent danger, of the act producing death. The act must be inherently and consciously dangerous to life, not such as casually produces death by misadventure. It must be dangerous in and of itself, as committed and when committed, whether death follow it or not.' (Pp. 246, 247)

"He went on to say:

" 'In our view of murder in the second degree, it goes in any case upon constructive intent to kill, intent imputed by law where there is no actual intent to kill.' (P. 249)"

Wis. J.I.—Criminal, Part II, 1110, concisely states:

"The first element of second degree murder requires that the defendant's conduct was imminently dangerous to another, that is, conduct dangerous in and of itself. It must have been conduct inherently and consciously dangerous to life and not such as might casually produce death by misadventure."

The evidence in this case which relates to the nature of the defendant's conduct is composed of the testimony of Dr. Robert G. Carlovsky, the pathologist who performed the autopsy upon the victim, and the defendant's confession. This evidence viewed in a light most favorable to the state establishes that the defendant took the victim into the bedroom, disrobed her, placed her on the bed, inserted his fingers into her vagina, and sodomized her. The defendant was a twenty-four year old male, while

the victim was a nine year old girl, four foot, five inches in height, weighing 63 pounds. This conduct was of such a nature as to cause, as autopsy revealed, a dilation of the child's anus with a tear, measuring about one-tenth of an inch, in the flesh of the anal area. Another tear, measuring one-third by two-thirds of an inch, was found in the flesh of the vaginal area. Small amounts of blood were found about the anus, inside the lower rectum, and inside the vaginal vault. Both the defendant's confession and the pathologist's testimony establish that the victim died during or immediately after the act of sodomy, and thus prior to the time the body was placed in the plastic bags.

Dr. Carlovsky testified that the cause of death in this case was asphyxiation, secondary to a cardio-pulmonary arrest. He explained this cause by stating that in his opinion the trauma to the vaginal and anal areas of the child activated her sympathetic nervous system causing primary shock which resulted in the stoppage of the heart. This heart attack resulted in the failure of the blood to circulate and thereby transport oxygen to and remove carbon dioxide from the body tissues. This failure of circulation thus caused death by asphyxiation, the condition where the body tissues have an insufficient amount of oxygen and excess carbon dioxide.

Activation of the sympathetic nervous system, Dr. Carlovsky testified, may occur as a result of physical trauma and also emotional trauma, such as caused by a frightful experience. Finally, Dr. Carlovsky testified that in his opinion death would occur through the activation of this mechanism in less than one percent of the cases of sexual molestation.

Although this court has stated the sole fact of the occurrence of death cannot establish that the conduct causing the death was imminently dangerous, *Seidler v. State*, *supra* at 461, 219 N.W.2d at 323, it is certainly an important consideration that the conduct, such as the conduct of the defendant in this case, in and of itself, with-

out the intervention of any other factor, caused the victim's death. Death in this case was not casually produced by misadventure and thus, in the sense that the defendant's conduct was capable of producing death in and of itself, that conduct was inherently dangerous to life.

That the conduct be capable of producing death in and of itself, however, is not the only factor in determining whether the conduct is imminently dangerous under the statute. The conduct must also present an apparent and conscious danger of producing death. *Hogan v. State, supra* at 236. Under the evidence here a jury could conclude beyond a reasonable doubt that the defendant's conduct presented such an apparent danger.

The testimony of the pathologist, Dr. Carlovsky, that in sexual molestation cases the occurrence of death caused as it was here would be rare does not render the jury's conclusion unreasonable. The requirement that the danger posed be apparent does not require that death be certain or even probable, in the sense that it is more likely than not. The pathologist's opinion as to the probability of death occurring by this cause was made in reference simply to cases of sexual molestation generally, and thus permits the reasonable inference that the probability under the circumstances of this case was appreciably greater.

An important consideration here is the size and tender age of the victim. This court has found the relative physical characteristics of the victim and assailant to be factors which may be considered in determining whether conduct is imminently dangerous. *Wangerin v. State, supra* at 435, 243 N.W.2d at 452; *Kasieta v. State,* 62 Wis.2d 564, 570–71, 215 N.W.2d 412, 415–16 (1974). It is not unreasonable to infer that the physical trauma which may be suffered by a 63 pound, nine year old girl due to an act of sodomy and vaginal molestation committed upon her by a twenty-four year old male will be greater than that suffered by an older or larger indi-

vidual. Likewise, it may also be reasonably inferred that this sort of experience and situation would be more frightening to a child, and thus cause greater emotional trauma. Since the sympathetic nervous system is activated by physical and emotional trauma, it is not unreasonable to conclude that where the victim is of a tender age and smaller size the probability of the activation of that system by these causes is greater than in the general case of sexual molestation.

Furthermore, the danger of death by shock caused by physical or emotional trauma is not completely outside the realm of common knowledge. In fact, the defendant in his confession even stated that upon the occurrence of the death of Lisa French, he supposed she had died of shock caused by his act.

Although the death may have been an occurrence unexpected by the defendant, that fact cannot diminish the danger in which the defendant by his conduct chose to place this child's life. On the basis of all the evidence it was reasonable for the jury to be convinced beyond a reasonable doubt that the defendant's conduct was imminently dangerous to another.

### Enticing a Child

The defendant contends the state failed to prove the offense of enticing a child for immoral purposes, in violation of sec. 944.12, Stats. That section states:

"Any person 18 years or over, who, with intent to commit any crime against sexual morality, persuades or entices any child under 18 years of age into any vehicle, building, room or secluded place may be imprisoned not more than 10 years."

The defendant's confession states:

"I then sort of helped her into the bedroom which was to the right of the living room. At the time I was highly sexually motivated and this prompted me to take Lisa into the bedroom."

The defendant's argument that it was not established he "induced," "solicited" or "allured" the child is only semantics. The statement that he "sort of helped" and "took" the victim into the bedroom obviously is sufficient evidence to permit the jury to conclude the defendant committed the conduct proscribed by this section of the statutes. The statute uses the word "persuades," and it is clear there was sufficient persuasion exercised here.

*Evidence of Prior Sex Crimes*

At the trial the prosecution called as a witness Arlene Penn, a woman who had lived with the defendant for a period of two years, including the period during which the offense and the investigation took place. During direct examination of this witness, the district attorney sought to elicit her knowledge of statements made by the defendant complaining of harassment of him by police. Miss Penn answered that the defendant had seemed upset because the police had questioned him concerning his whereabouts on the night Lisa French disappeared. The district attorney then asked Miss Penn if that was the only time the defendant complained about police questioning. What follows in the record contains the testimony, the admission of which the defendant claims constitutes error:

"A. [Miss Penn] You mean other incidents?
"Q. [district attorney] Yes.
"A. Well, there was one other incident when he complained, yes.
"Q. What was that?
"A. He had to go down to the police station for—
"MR. BUSLEE [defense counsel]: May I approach the bench?

"THE COURT: You may do so. Just a moment, please. "[Discussion at the bench outside hearing of the jurors].

"THE COURT: Mr. Reporter, would you read the question and that portion of the answer that you have, and then I will instruct the witness to finish her answer.

" . . .

"THE COURT: You may finish the answer.

"THE WITNESS:

"A. Well, one time when the police called him and he was charged with having relations with a babysitter, and he felt that—I think he felt they were being unfair or picking on him.

"MR. BUSLEE: May I approach the bench, please?

"[Whereupon, a discussion was had at the bench outside the hearing of the jurors]"

The defendant claims that this statement of Arlene Penn made before the jury that the defendant had been previously charged with a sex crime constitutes grounds for a new trial. The record, however, shows that no objection was made at trial to this statement, and, therefore, the defendant has waived the right to review of this alleged error upon appeal. *State v. Frizzell,* 64 Wis.2d 480, 484, 219 N.W.2d 390, 393 (1974); *Kwosek v. State,* 60 Wis.2d 276, 281, 208 N.W.2d 308, 310 (1973).

The defendant, nevertheless, contends the introduction of this statement constitutes "plain error" under sec. 901.03(4), Stats. This subsection is included to preserve the discretion of this court to review questions in the interest of justice even though they were not properly raised and preserved at trial. *See* sec. 251.09, Stats.; Wisconsin Rules of Evidence, 59 Wis.2d Rp. 14 (1973); *See also State v. Spraggin,* 71 Wis.2d 604, 616, 239 N.W.2d 297, 306 (1976). The statement now objected to by the defendant, however, when considered in the context of the case as a whole, does not call for this court's discretionary review. Also, the evidence in this case, especially considering defendant's confession, was

strong in establishing defendant's involvement in the
death of Lisa French. At most, this simple statement
refers to the fact the defendant was charged with
another sex crime. This is the sole reference to this
crime before the jury, and it was never stated that the
defendant was convicted of this offense. Furthermore,
the record shows that defense counsel asked to approach
the bench and had discussion with the trial judge im-
mediately before and after this statement came in. This
indicates defense counsel was well aware of this testi-
mony and did not object, although whatever reasons he
may have had for not objecting are not clear.

Also, comparison of the circumstances of this case with
those of *Kwosek v. State, supra* would dictate that the
court should not discretionarily review this alleged error.
In that case, more than one reference was made to the
defendant's prior conviction for second-degree murder.
This court held the failure to object at trial constituted
waiver of challenge to this alleged error. Here the state-
ment admitted is much less serious.

## Admissibility of Confession

Prior to trial the trial court held a *Goodchild* hearing
to determine if the defendant's confession of August 8,
1976 was voluntary and constitutionally antiseptic.
Testimony concerning all of defendant's contacts with the
authorities regarding this offense was submitted, and the
trial judge concluded, in a written opinion, the confes-
sion was admissible. Upon this appeal the defendant
challenges this conclusion, claiming the confession was
not voluntary.

■■■■■
This court will not upset a trial court's determination
in respect to the voluntariness of a confession unless it
appears that the findings made were against the great
weight and clear preponderance of the evidence. *Gren-
nier v. State*, 70 Wis.2d 204, 209–10, 234 N.W.2d 316,

320 (1975); *Blaszke v. State,* 69 Wis.2d 81, 86, 230 N.W.2d 133, 136 (1975). Furthermore, as to the credibility of disputed testimony in relation to evidentiary facts, this court will not substitute its judgment for that of the trial court. *Triplett v. State,* 65 Wis.2d 365, 367–69, 222 N.W.2d 689, 690–92 (1974).

The question of voluntariness of a confession must be determined by the totality of the circumstances test. *Blaszke v. State, supra* at 87, 230 N.W.2d at 137. The essential consideration is whether the confession was coerced, that is, the product of improper pressures exercised by the police. The defendant must not be the victim of a conspicuously unequal confrontation in which the pressures brought to bear upon him by the interrogators exceed the defendant's ability to resist. *Grennier v. State, supra* at 210, 234 N.W.2d at 320. Thus, in making this review, it is important to balance the personal characteristics of the defendant with pressures to which he was subjected. *State v. Wallace,* 59 Wis.2d 66, 81, 207 N.W.2d 855, 863 (1973).

The record shows, on the day of the confession, the defendant was 25 years old and had graduated from high school. He was not ill and had had a good night's rest. Those officers with whom the defendant had contact found him to be intelligent and well-read. Although his record contains no prior offenses, the defendant had had contact with the police on prior occasions, including four times in relation to this particular crime.

It is first alleged that the defendant was coerced into taking the polygraph examination on August 2, 1976 in Madison. The defendant specifically refers to the statement made to him by Agent Tomaselli that if the defendant attempted to leave the conference room, he would be prosecuted.

A specific finding as to this claim was not made by the trial court, and thus it is necessary to independently

review the record. *Blaszke v. State, supra* at 86, 230 N.W.2d at 136–37. Even assuming the defendant was coerced to take the polygraph, it is difficult to conceive how that could affect the voluntariness of defendant's decision to confess six days later. The record, however, shows that this contention, that the defendant was coerced to take the polygraph test, is unfounded.

The defendant was fully aware of his right to refuse to take the polygraph. He was advised of these rights both when he arrived at the safety building and just prior to the test in Madison. Agent Tomaselli testified that after he informed the defendant that he would be charged if he refused to take the test, the defendant stated, "All right, if I cooperate is there some way that you can help me get this thing resolved?" Captain Heller testified that the defendant stated he would take the examination because he was not involved. In addition, a period of over four hours elapsed between the time the defendant was told he would be charged and the polygraph examination commenced. After the examination, the defendant consented to take another test on August 8, 1976, and, Captain Heller testified, the defendant stated he wished to take the examination again because he was sure he could do better. At no time was the defendant restrained by handcuffs or physical pressure by the officers. In fact, a complete review of the evidence as to the circumstances of August 2nd indicates a rather relaxed relationship between the defendant and the officers. We think the defendant voluntarily consented to take the polygraph examination.

Defendant contends he was denied the right to an attorney when he requested one at the State Crime Laboratory in Madison just prior to taking the polygraph examination. The trial court concluded that the defendant did not request an attorney, nor was he denied one.

There is no dispute that as the defendant, Agent Tomaselli and Anderson jointly read through the rights

in the polygraph examination statement of consent, the defendant stated, "Maybe" or "Possibly I should talk to an attorney." A conversation ensued during which, defendant claims, Anderson stated that he didn't need an attorney. Anderson denied making this statement. The trial judge was entitled to find that Anderson did not make this statement, for he judges the credibility of the evidence. *Triplett v. State, supra* at 368, 222 N.W.2d at 691.

The record substantially establishes that when the defendant inquired as to obtaining counsel, Agent Tomaselli immediately asked the defendant if he knew of any attorney he desired and stated they would obtain one. Both Tomaselli and Anderson testified as to this statement. The defendant then stated he didn't need an attorney and he would take the test. The defendant then signed a waiver of his constitutional rights.

On the basis of this record it was not against the great weight and clear preponderance of the evidence for the trial judge to conclude the defendant had not requested an attorney, or at minimum, voluntarily changed his mind. The defendant's statement, considered in light of the relaxed situation, did not amount to a demand for legal counsel. Further discussion resulted in a decision on the part of the defendant that he did not need or desire counsel.

Next the defendant claims Agent Tomaselli and Anderson used coercive interrogation tactics to compel him to make and sign his statement of confession on August 8, 1974. Specifically, three improper tactics are alleged.

First, defendant claims he was confronted with fraudulent and improper evidence which the interrogators claimed could prove the case against him. It is asserted that Tomaselli and Anderson threatened to use the results of the first polygraph examination against him. This was denied by both Tomaselli and Anderson, and the trial judge had the right to believe them. The de-

fendant claims Tomaselli told him that the authorities had a fingerprint which could link him to the crime, and that such was a false assertion. There is no evidence that this was a false assertion, and the mere fact that no fingerprint was offered into evidence at trial does not show Agent Tomaselli was lying, because at trial the state possessed the confession, clearly enough to convict the defendant. *See Blaszke v. State, supra* at 88–89, 230 N.W.2d at 137–38. Moreover, Tomaselli testified that in discussing fingerprints generally, he stated the authorities had a print that gave an indication of a scar and mentioned the special characteristics of certain prints. Anderson testified he could not recall a statement made that concerned a fingerprint which could be proved to be the defendant's. On the basis of this evidence, the trial judge could easily have concluded that fingerprints were discussed generally, and no statement was made that a print existed which could be proved to have been made by the defendant. Defendant also claims he was told hair samples had been obtained linking him with the offense. Indeed, hair samples found on the victim which were consistent with the hair of Arlene Penn, who was living with the defendant, were admitted into evidence at trial. The testimony of Tomaselli and Anderson further indicates that hair samples were only discussed generally, and there is no evidence, other than defendant's testimony, that the defendant was told the authorities possessed a sample matching his hair.

At to a general assertion by Tomaselli that enough evidence already existed to convict the defendant, nothing in the record would establish that Tomaselli did not believe this to be true. *See Blaszke v. State, supra* at 88–89, 230 N.W.2d at 137–38. Finally, in respect to the defendant's claim that he was confronted with a fraudulent case against him, the record merely shows that Tomaselli and Anderson engaged in with the defendant, who was somewhat knowledgeable about methods of

criminology, a discussion about his case and general methods of proof. There is no indication of deliberate deception or use of misinformation. In addition, the confrontation of the defendant with the information against him, whatever that may be, does not amount to the utilization of overwhelming force or psychology. *Krueger v. State,* 53 Wis.2d 345, 356, 192 N.W.2d 880, 886 (1972).

Defendant also claims he was psychologically coerced by the statement of the interrogators that they would "throw the book at him" if he did not confess. He claims this means he would be charged with more serious offenses than those he had committed. That is not necessarily the only interpretation of that phrase, but, moreover, both Tomaselli and Anderson denied making such a statement, and the trial judge was entitled to believe them.

Finally, the defendant claims he was induced by promises of help and leniency. At the maximum, the record shows that Tomaselli and Anderson told the defendant that if he would confess, they would see that he would get help. This statement is obviously, as the record indicates, in relation to the perception of both Tomaselli and Anderson that the defendant had a sexual problem. The defendant testified that Anderson told him that they did not believe he was a killer, but that he had a sex problem, for which he could get help, if he confessed. As this court noted in *State v. Cydzik,* 60 Wis.2d 683, 692, 211 N.W.2d 421, 427 (1973), statements that cooperation with authorities will result in a benefit to the confessor do not approach creating compelling pressures which overcome the individual's will to resist.

Considering the totality of the circumstances surrounding the defendant's confession, these circumstances are significantly marked by the relaxed and friendly relationship between the defendant and the law enforcement officials. At no time was the defendant physically harmed

or restrained. The record shows that on the day he confessed, the defendant voluntarily arrived at the Fond du Lac safety building, and, although he declined to take the second polygraph test, he stated he did not want an attorney and would talk to the officers about the Lisa French matter. After completing his statement, the defendant seemed relaxed and expressed relief to get the matter "off the top of his head." Clearly, the conclusion that the defendant voluntarily confessed is not against the great weight and clear preponderance of the evidence.

*Exclusion of Evidence Relating to Polygraph Examination*

Prior to trial, the prosecution made a motion to exclude from the evidence at trial any reference to the circumstances surrounding the polygraph examination on August 2, 1974, and any reference to the examination scheduled for August 8, 1974. The trial judge rendered a decision upon this motion orally, stating:

"I think the law is very clear in Wisconsin now that there can be no reference made to the polygraph examination that was taken or the one that was to be taken in the Safety Building in Fond du Lac; and if that should creep into the record, I guess that I would have no alternative except to declare a mistrial.

". . .

"[I]n my opinion if you attempt to rely upon and bring into the record any testimony with regard to his [the defendant's] being taken to Madison for further interrogation, and bring into the record the circumstances with regard to his requesting a lawyer, and being in Madison for the purpose of taking a lie-detector test, which, I am sure, everyone here agrees, may not under any circumstances be put into the record. I think by going into the August 2d episode that you will cause a mistrial. With regard to Mr. Anderson's appearance on August 8th, on the day that the inculpatory was given, I have not said any word about that."

The defendant contends that, by making this ruling, the trial court erred because all this evidence was admissible or relevant to the question of the truthfulness of the inculpatory statement. We do not agree.

Prior to the decision in *State v. Stanislawski,* 62 Wis.2d 730, 216 N.W.2d 8 (1974), polygraph evidence, *i.e.,* graphs and the examiner's opinion thereon, was unconditionally inadmissible upon trial. *Meyer v. State,* 25 Wis.2d 418, 425, 130 N.W.2d 848, 851 (1964). In *Stanislawski,* this court lifted the ban on polygraph evidence but only where certain conditions are met. 62 Wis.2d at 742, 216 N.W.2d at 14.

Furthermore, prior to *Stanislawski,* this court held that any reference to a polygraph examination, such as a defendant's offer or refusal to take such a test, may also be held inadmissible by a trial court. *State v. Baker,* 16 Wis.2d 364, 368, 114 N.W.2d 426, 428 (1962). The rationale for excluding such evidence is that since the results are inadmissible, reference to the test could serve no purpose but to obtain a prejudicial effect, especially, for example, where a defendant exercises his right to refuse to take a polygraph test.

In *Hemauer v. State,* 64 Wis.2d 62, 218 N.W.2d 342 (1974), a case after *Stanislawski,* this court held it was still proper for the trial court to exclude from evidence an offer by the defendant to submit to a polygraph test, where the test results, if a test had been given, would not be admissible because the conditions of *Stanislawski* had not been met. *Hemauer v. State, supra* at 75–76, 218 N.W.2d at 348. The court's discussion makes it clear that such references were excluded not simply because they relate to polygraph tests, but for the reason that their probative value is outweighed by the risk of prejudice. *See* sec. 904.03, Stats. Thus, while polygraph test results are to be excluded if there is no compliance with *Stanislawski,* other evidence relating to polygraph tests

should be excluded if it is not relevant or if its probative value is outweighed by the danger of unfair prejudice.

In the instant case, first of all, there is some dispute between the parties as to what evidence the trial judge's decision excluded. It is obvious that the trial judge ruled that no direct evidence as to any of the events of August 2nd was admissible. Furthermore, he excluded any reference to the polygraph test that was scheduled for August 8th. The record shows, however, the trial judge did not intend to limit evidence as to the circumstances surrounding the defendant's inculpatory statement, except as to the fact that a polygraph examination was scheduled for that day.

It was proper to exclude the results of the August 2nd polygraph test, because there was no compliance with the first condition in *Stanislawski*—that the district attorney, defendant and his counsel all sign a written stipulation providing for defendant's submission to the test and for submission at trial of the results. *Stanislawski, supra* at 742, 216 N.W.2d at 14.

As to the entire circumstances, besides the polygraph test results, on August 2, 1974, we agree with the argument of the state that direct evidence as to these matters would have been irrelevant to the question of the trustworthiness of the inculpatory statement. There is no showing how evidence of the events of that day would have any tendency to make the truthfulness of the confession more probable or less probable than it would be without such evidence. While the jury is to make its determination of credibility of the confession based upon the totality of the circumstances surrounding that confession, the connection between the events of August 2nd and the defendant's confession six days later had become so diluted as to dissipate whatever effect, if any, there could have been on defendant's trustworthiness in

making the confession. Thus, such evidence was properly excluded.

The trial judge's exclusion of reference to the polygraph test scheduled for August 8, 1974, was clearly reasonable as excluding evidence which was more prejudicial than probative. Had a test been administered on August 8th, the results would have been inadmissible, for no stipulation pursuant to the conditions of *Stanislawski* was entered into. Thus, the probative value of evidence showing a polygraph test was scheduled is greatly decreased, for where the results would be inadmissible, neither side risks anything by agreeing to complete the test. On the other hand, evidence relating to the polygraph test scheduled for August 8th could only, under the circumstances, be considered very prejudicial to the defendant, because although he initially agreed, he later exercised his right to refuse to submit to the test.

*Change of Venue*

The defendant contends that the trial court committed error by denying his motion for a change of venue upon the ground that due to pretrial publicity an impartial trial could not be had in Fond du Lac County. In connection with that motion the defendant filed an affidavit which outlined all the media coverage of the disappearance and search for Lisa French and the defendant's arrest and trial.

A motion for change of venue is addressed to the sound discretion of the trial court. *Ruff v. State,* 65 Wis.2d 713, 720, 223 N.W.2d 446, 450 (1974). In exercising this discretion, the trial judge is bound to grant the motion if there exists, from the evidence shown or the experience of the trial court, a reasonable likelihood that a fair trial cannot be had. *State ex rel. Hussong v. Froelich,* 62 Wis.2d 577, 591, 215 N.W.2d 390, 398

(1974). Upon appeal this court has the duty to conduct an independent evaluation of the evidence and documents presented in support of the motion. *Jones v. State,* 66 Wis.2d 105, 109, 223 N.W.2d 889, 891 (1974).

The major emphasis of the defendant's contention as to this issue is placed upon what defendant claims to be massive and continuous newspaper and media coverage of the circumstances of this case. It is obvious that the disappearance of a young girl and the subsequent discovery of her dead body is a matter which would generate extensive publicity. The mere fact that such publicity has taken place, however, does not establish prejudice. *State ex rel. Hussong v. Froelich, supra* at 594, 215 N.W.2d at 400. Furthermore, while the nature of a crime is a factor to be considered, it is not enough to be conclusive of prejudice. *Id.* at 595, 215 N.W.2d at 400.

Although all but one of the prospective jurors stated they had been exposed to the news coverage, an examination of the newspaper articles submitted by affidavit reveals that none of the publicity was calculated to form public opinion against the defendant. The vast majority of these articles were informational only, covering the facts of the disappearance and search. Some of the articles were related to the personal grief of the victim's family, and some were concerned with the effect of this crime upon the community. Whatever editorialization existed was reflective in nature, not written to incite the reader. In relation to the subsequent investigation and arrest of the defendant, the newspaper coverage does not appear inflammatory, but again principally informational. In no instance was the defendant referred to as the perpetrator or did the articles call for his conviction. In *Thomas v. State,* 53 Wis.2d 483, 492, 192 N.W.2d 864, 868 (1972), this court stated:

"The type of news is important in the claim of potential prejudice. Uneditorialized news of purely in-

formational nature may inform possible members of a jury but such news does not necessarily create prejudice. An informed jury is not necessarily a prejudicial one."

Moreover, the timing of these articles is removed from the period of the trial, and thus, whatever effect these materials may have had would have been somewhat dissipated. *Tucker v. State,* 56 Wis.2d 728, 735, 202 N.W.2d 897, 900 (1973). Almost all the newspaper accounts submitted, although not dated, clearly were published near the time of the victim's disappearance and discovery of the body which occurred over one year before the trial. Another group of the articles were apparently published soon after the defendant's arrest, over five months before trial, and during early preparations for trial.

The defendant refers to an incident which occurred during the impanelling of the jury. Evidently, somehow information had been received by the court concerning a threat upon the defendant and his counsel. While this may be considered, it does not appear to be more than the conduct of a single individual, rather than evidence of the sentiment of the community.

One of the best indicators of whether there existed a reasonable likelihood of prejudice in this case, and the factor upon which the trial court heavily relied, is the ease with which the jury was selected. Indeed, considering the nature of the case, the transcript of the jury selection, which includes separate voir dire in chambers of each potential juror, shows that the ease of this selection was surprising. It was only necessary to examine 32 jurors in order to select the jury. Only five persons stated they had formed an opinion and were excused. Two others were excused because of doubts of impartiality, and one was excused because of prior dealings with the district attorney. Of the remaining panel, each person stated unequivocally that he or she had no opinion as to the defendant's guilt or innocence. This impanelling

procedure compares very favorably with the impanelling in *State v. Dean,* 67 Wis.2d 513, 227 N.W.2d 712 (1975), a multiple murder case where it was necessary to examine 68 prospective jurors. In *Dean* the court found no abuse of discretion by the trial judge in denying a motion for change of venue.

On the basis of all the evidence on record in this case it does not appear that the trial judge, who was in a position to sense the true sentiment of the community, abused his discretion in denying this motion.

*New Trial in Interests of Justice*

It is contended a new trial should be granted in the interests of justice, but we have said time and again this court may not grant a new trial in the interest of justice unless it is at least convinced that the defendant should not have been found guilty. *McAllister v. State,* 74 Wis.2d 246, 254, 246 N.W.2d 511, 516 (1976). No miscarriage of justice appears to have probably occurred in the instant case. The evidence establishes the defendant's guilt beyond a reasonable doubt. The defendant was fairly tried and convicted.

*By the Court.*—Judgment and orders affirmed.