COURT OF APPEALS
DECISION
DATED AND FILED

October 14, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1041-CR**

Cir. Ct. No. 2021CF695

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

DUSTIN JAMES NORRING,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for St. Croix County: R. MICHAEL WATERMAN, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Dustin James Norring appeals a judgment of conviction for one count of receiving stolen property (value greater than $2,500

but not exceeding $5,000), as a party to a crime. He also appeals an order denying his motion for postconviction relief.

¶2 On appeal, Norring argues that certain evidence was erroneously admitted at his jury trial and that the circuit court erred when instructing the jury. We agree with the State that Norring forfeited these arguments by failing to object to the evidence and jury instructions in question at trial. While Norring argues, in the alternative, that his trial attorney was constitutionally ineffective by failing to object to the evidence and jury instructions, we conclude that the circuit court properly denied Norring's ineffective assistance claims without an evidentiary hearing. Finally, we reject Norring's argument that there was insufficient evidence to establish the value of the stolen property that he received. Accordingly, we affirm Norring's judgment of conviction and the order denying postconviction relief.

## BACKGROUND

¶3 The State initially charged Norring with burglary, as a party to a crime, but later filed an amended information containing a single charge of receiving stolen property (value greater than $10,000), as a party to a crime, a Class G felony. *See* WIS. STAT. § 943.34(1)(c) (2023-24).[1] Norring proceeded to a jury trial on that charge.

¶4 At trial, Danny, the owner of a storage facility in Roberts, Wisconsin, testified that on the night of September 26-27, 2020, a break-in

---

[1] While the offense at issue in this case took place in 2020, the relevant statutes have not changed since that time. Accordingly, for convenience, all references to the Wisconsin Statutes are to the 2023-24 version.

occurred at his facility in a storage unit that was rented by George.[2] Danny reported the burglary to both George and law enforcement.

¶5 George testified that after Danny notified him of the burglary, he went to his storage unit with his son, Allen,[3] to determine what had been taken. When he and Allen went home that evening, they compiled a list of items that were missing from the storage unit, which was introduced at trial as Exhibit 14. The missing items included tools, science kits, Lego sets, and Gundam kits, which Allen explained are "really complex Japanese robot models." Exhibit 14 listed a "value" for each missing item and showed that the total value of the stolen items was $10,538. Norring did not object when the State offered Exhibit 14 into evidence at trial.

¶6 George testified that the value of just the science kits, the Lego sets, and the Gundam kits taken from the storage unit "would total over $6,000." He explained that some of the Lego sets in the storage unit were "inexpensive," but others were "really big sets" that were "quite expensive." He further explained that Gundam kits are "similar in price to Legos from $10 to $15 a piece to the big ones [that] are a couple hundred dollars," and he testified that the storage unit contained "quite a few" of the large kits. George testified that he had "receipts for almost all of the Gundam" kits, which were items 1 to 24 on Exhibit 14, "because those were the ones we got recently." He and Allen also obtained receipts for some of the larger Lego sets from Lego.com. The prices listed for the other items

---

[2] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4), we use pseudonyms when referring to the owner of the storage facility, the renter of the individual storage unit, and the renter's son.

[3] Allen was 20 years old at the time of trial.

on Exhibit 14 were from memory or were obtained from people who had given those items to George's family over the years. George testified that none of the items that were taken from the storage unit had been recovered.

¶7 Allen testified that he and his brother had acquired nearly 100 Lego sets growing up and later began acquiring Gundam kits, which sell for "[a]nywhere from 50 to 200 bucks." He explained that their Lego sets and Gundam kits were placed in the storage unit because of a remodeling project at his family's home. Allen confirmed that after the burglary at the storage unit, he and George created Exhibit 14, which identified 116 missing items.

¶8 Allen further testified that while searching online for the stolen property between September 29 and October 1, 2020, he saw that some of the Lego sets and science sets had been posted to Facebook Marketplace. Allen took screen shots of the posted items, and as to each screen shot, he testified regarding the items depicted and explained why he believed the items were his. Allen noted that some of the items were listed for sale for $500. He also noted that the seller of the items was listed as "Dustin James" in Wyoming, Minnesota. When asked his opinion about the total value of the items posted for sale on Facebook Marketplace, Allen responded, "Probably close to like $6,000."

¶9 Lieutenant Charles Coleman of the St. Croix County Sheriff's Office testified regarding his investigation of the burglary at George's storage unit. Coleman testified that he reviewed surveillance video footage provided by Danny, which showed a "metallic blue-ish/gray Town and Country minivan" at the storage facility on the night of the burglary. The video also showed two males approaching George's storage unit that night.

¶10 Coleman further testified that he reviewed Allen's screenshots from Facebook Marketplace, confirmed that the items were still listed for sale, and, using a female alias, contacted the seller about purchasing the items. The seller replied that the items were still available and provided a number for Coleman to call. One of Coleman's female colleagues then spoke with the seller by phone.

¶11 Coleman noted that the "Facebook profile IP address" for the "Dustin James" Facebook profile was "Dustin Norring or facebook.com\dustin.norring." Facebook records showed that the profile was created in 2009; the location associated with the profile was Maplewood, Minnesota; the profile was registered under a yahoo.com email address containing the name "Dustin Norring"; and the profile was linked to a PayPal account associated with a gmail.com email address containing the name "Dustin Norring."

¶12 Coleman provided the name "Dustin Norring" and the birthdate associated with the "Dustin James" Facebook profile to the Minnesota State Patrol, which provided a copy of Norring's driver's license photograph. Coleman testified that the driver's license photograph appeared to be of the same individual shown in photographs from the "Dustin James" Facebook account.

¶13 The Facebook records that Coleman received for the "Dustin James" Facebook account contained various text messages, including those that Coleman had sent under his alias asking if the posted items were still available. When examining the records, Coleman noticed a conversation about Lego sets between "Dustin James," Melissa Hirsch, and Svalin Odinsson. Coleman subsequently identified Odinsson as William Miller. On November 9, 2020, Coleman went to Hirsch's Wyoming, Minnesota, home and saw a "metallic gray-ish/green … Chrysler Town and Country minivan" registered to Hirsch in the

driveway. When Coleman interviewed Hirsch that day, Hirsch confirmed that she and Miller were in a romantic relationship.

¶14 Coleman then received and examined Facebook records associated with Hirsch's account and observed over 800 messages between Hirsch and the "Dustin James" profile. In a message from October 1, 2020, "Dustin James" asked Hirsch, "Those Legos ain't from Wisconsin, are they?" "Dustin James" continued, "This lady wants to check them out. She's from Wisconsin so I gave her my phone number and my voice was acting on an echo in the background and she wanted to ask me some questions. I told her I was driving." When Hirsch replied that the Lego sets were from Wisconsin, "Dustin James" responded, "Fuck." "Dustin James" inquired whether the Lego sets were from "[l]i[k]e Prescott"—which is where Coleman had claimed to live when communicating with "Dustin James"—and Hirsch responded, "Yes." Hirsch then messaged, "No, but that don't mean nothing. Just ignore them," and "Dustin James" responded, "So don't go meet her."

¶15 Coleman also received and reviewed records for Miller's Facebook account, which included photographs of a Lego set, a telescope, and Gundam-type sets. Coleman testified that one of the victims identified those items as his property. The first of those photographs was sent from Miller's Facebook account at 9:04 a.m. on September 27, 2020—the morning after the burglary at George's storage unit.

¶16 Coleman also noted a Facebook conversation between Miller and "Dustin James" on October 1, 2020, in which "Dustin James" asked whether "[t]hose Legos" were from Wisconsin and stated that a woman from Wisconsin wanted to "check them out." Miller replied, "That shit came from Roberts,

6

Wisconsin. What does the pictures look like that you took?" "Dustin James" then sent photographs of various items to Miller, including several Lego sets and science kits.

¶17 On cross-examination, Coleman agreed that there was nothing in the messages between "Dustin James" and Hirsch or Miller about the Lego sets or other items being stolen. Coleman stated it appeared that Norring "was posting the items for the other two."

¶18 On redirect examination, Coleman testified that during his interview with Hirsch on November 9, 2020, when he asked whether anyone other than Norring or Miller had used Hirsch's van, Hirsch responded by either shaking "her head no or just whisper[ing] no." Later that day, Hirsch called Coleman and said "[t]hat she knew where the stolen property was at and [that] she could help [him] locate it." The next day, Hirsch again called Coleman and stated "that she wanted to remain anonymous but that she'd be able to help locate the items from this burglary, as well as others."

¶19 Following the close of evidence, the circuit court stated during the jury instruction conference that the evidence regarding the value of the stolen property that Norring had allegedly received did not "support[] a question of value in excess of $10,000." The State agreed with that determination. The court therefore stated that it would ask the jury two questions regarding value: (1) whether the property's value exceeded $2,500, which would make the offense a Class I felony; and (2) whether the value exceeded $5,000, which would make the offense a Class H felony. *See* WIS. STAT. § 943.34(1)(bf)-(bm). Both Norring and the State agreed with that approach. Consistent with the pattern jury instruction for receiving stolen property, which both parties had requested, the

court ultimately instructed the jury as follows regarding the property's value: "'Value' means the market value of the property or the replacement cost, whichever is less. Before you may answer 'yes[,]' you must be satisfied beyond a reasonable doubt that the value of the property was more than the amount stated in the question." *See* WIS JI—CRIMINAL 1481 (2012).

¶20    During its deliberations, the jury asked a series of questions about determining the property's value. First, the jury asked, generally, "What are we looking at specifically when determining the value of property?" The jury then asked, more specifically, whether it should "[d]etermine value of property we believe was in the possession of the defendant received" or "[d]etermine the value of the property listed in the complaint."

¶21    When discussing these questions with the parties, the circuit court noted that it was unclear what the jurors meant by the term "complaint," and the court surmised that they may have been referring to Exhibit 14, the "inventory of everything that was missing." With the parties' agreement, the court ultimately provided the following response to the jurors' questions:

> Answer the value questions only if you find Mr. Norring guilty of receiving stolen property, as party to a crime.
>
> When determining the value of the property, consider only the stolen property for which you found Mr. Norring guilty.
>
> "Value" means the market value of the property or the replacement cost, whichever is less. When deciding value, you may consider all of the admissible evidence, giving it the weight you believe it should receive. When weighing the evidence, you may take into account matters of your common knowledge and your observations and experience in the affairs of life.

¶22    The jury found Norring guilty of receiving stolen property and determined that the value of the property exceeded $2,500 but did not exceed

$5,000. The circuit court subsequently withheld sentence and placed Norring on probation for a period of two years.

¶23 Norring moved for postconviction relief. As relevant to this appeal, he first argued that Exhibit 14—the inventory listing 116 items that were missing from George's storage unit—"was inadmissible and prejudicial in its unredacted form" and should have been redacted to include only those items that Norring "was alleged to have received." Alternatively, Norring argued that the circuit court should have instructed the jury that the only relevant items listed on Exhibit 14 "were the ones that matched what Norring was alleged to have received."

¶24 Second, Norring argued that pages 100-108 of Exhibit 39—Miller's Facebook records—should have been excluded. Those pages included photographs from Miller's Facebook account showing items that George claimed had been taken from his storage unit. The pages also included a Facebook conversation between Miller and a person named "Mike Eggum," in which Miller stated, "Anyone need collectables," and "Check out this price." Norring argued that this evidence should have been excluded because the items depicted in the photographs "were not items that Norring had posted, so therefore these were not items that Norring had allegedly received."

¶25 Third, Norring asserted that the jury was presented with alternative theories of party-to-a-crime liability—i.e., whether he received only the property shown in his Facebook posts or all of the property listed on Exhibit 14. According to Norring, these alternative theories deprived him of a unanimous verdict.

¶26 Fourth, Norring argued that the circuit court erred by using the standard jury instruction for receiving stolen property because that instruction "did

not include a date guide for correctly measuring either the market value or replacement value of the received goods."

¶27    Fifth, Norring asserted the State had failed to prove that he received stolen property with a value exceeding $2,500.

¶28    Sixth, Norring argued that his trial attorney was constitutionally ineffective by failing to raise the evidentiary and instructional issues alleged in Norring's postconviction motion.   Norring therefore requested a *Machner*[4] hearing.

¶29    The circuit court entered a written order denying Norring's postconviction motion in its entirety, without holding a *Machner* hearing. Norring now appeals.

## DISCUSSION

### I. Norring forfeited his arguments regarding alleged evidentiary and jury instruction errors.

¶30    On appeal, Norring renews his arguments that the circuit court improperly admitted both Exhibit 14 in its unredacted form and pages 100-108 of Exhibit 39.   Norring further contends that the prosecution's "equivocation as to which criminal conduct was on trial, coupled with instructions that did not limit the jury's consideration of distinct alternatives, led to a situation where the jury was not required to be unanimous in its verdict."   To prevent that possibility from occurring, Norring asserts that the jury should have been given a version of WIS JI—CRIMINAL 517 (2010).   Additionally, Norring argues that the jury "did

---

[4] *See **State v. Machner**,* 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

not receive proper instruction to assist it in determining the value of the property[] for which Norring was allegedly liable."

¶31     Norring concedes, however, that his trial attorney did not object to the admission of either the unredacted version of Exhibit 14 or pages 100-108 of Exhibit 39.  Norring also concedes that his trial attorney failed to request that the circuit court provide the jury with a version of WIS JI—CRIMINAL 517 (2010). Furthermore, our review of the record shows that counsel did not object to the jury instructions based on any concern regarding jury unanimity, nor did counsel object to the instruction regarding the value of the property that Norring allegedly received.

¶32     The "failure to object, even to a claimed structural constitutional violation, forfeits the challenge."  *State v. Klapps*, 2021 WI App 5, ¶29, 395 Wis. 2d 743, 954 N.W.2d 38 (2020).  We therefore agree with the State that Norring has forfeited his arguments regarding the circuit court's alleged evidentiary and jury instruction errors.  Accordingly, our review of those issues is limited to determining whether Norring's trial attorney was constitutionally ineffective by failing to object.  *See State v. Counihan*, 2020 WI 12, ¶28, 390 Wis. 2d 172, 938 N.W.2d 530 ("Generally, if a claim is forfeited, we address that claim in the context of ineffective assistance of counsel.").

## II. The circuit court properly rejected Norring's ineffective assistance of counsel claims without an evidentiary hearing.

¶33     To prevail on an ineffective assistance of counsel claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To prove deficient performance, the defendant must point to specific

acts or omissions by counsel that are "outside the wide range of professionally competent assistance." *Id.* at 690. To demonstrate prejudice, the defendant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. If a defendant fails to make a sufficient showing on one prong of the *Strickland* test, we need not address the other. *Id.* at 697.

¶34 Whether an attorney rendered ineffective assistance is a mixed question of fact and law. *State v. Nielsen*, 2001 WI App 192, ¶14, 247 Wis. 2d 466, 634 N.W.2d 325. We will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* However, whether the defendant's proof is sufficient to establish ineffective assistance is a question of law that we review independently. *Id.*

¶35 A defendant who alleges ineffective assistance of counsel is not automatically entitled to an evidentiary hearing on that claim. Instead, a court may deny the defendant's motion without a hearing if the motion presents only conclusory allegations or if the record otherwise conclusively demonstrates that the defendant is not entitled to relief. *See State v. Allen*, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433. Whether a postconviction motion raised sufficient facts so as to require an evidentiary hearing is a question of law that we review independently. *Id.*

¶36 Here, we agree with the State and the circuit court that the record conclusively shows that Norring's trial attorney was not ineffective by failing to object to the admission of Exhibit 14 or pages 100-108 of Exhibit 39, or by failing to object to the jury instructions on party-to-a-crime liability and value. As such,

the court did not err by rejecting Norring's ineffective assistance claims without an evidentiary hearing.

*A. Exhibit 14*

¶37 In its order denying postconviction relief, the circuit court determined that the unredacted version of Exhibit 14 was admissible and that its admission did not prejudice Norring. We agree with the court's analysis.

¶38 First, the circuit court reasonably concluded that the evidence was relevant under WIS. STAT. § 904.01[5] because the State needed to prove that Norring, who was charged with receiving stolen property as a party to a crime, had "participated in the crime of receiving stolen property." In other words, the State needed to prove that Norring had either directly committed the crime of receiving stolen property or had intentionally aided and abetted the commission of that offense. *See* WIS. STAT. § 939.05(2)(a)-(b).[6] Thus, as the circuit court aptly noted, "The State's case was not restricted to the property that Mr. Norring advertised on Facebook." Instead, the State could also attempt to meet its burden of proof by showing that Norring aided and abetted Miller and Hirsch in their receipt of the victims' stolen property. Consequently, the unredacted version of Exhibit 14 was relevant to show the total amount of stolen property involved in the

---

[5] Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01.

[6] In addition to directly committing a crime or intentionally aiding and abetting its commission, a person may be guilty of an offense as a party to a crime if he or she "[i]s a party to a conspiracy with another to commit it or advises, hires, counsels or otherwise procures another to commit it." WIS. STAT. § 939.05(2)(c). Here, the State proceeded on the theory that Norring had either directly committed the crime of receiving stolen property or had aided and abetted the commission of that crime.

13

criminal enterprise in which Miller, Hirsch, and Norring were allegedly participants.

¶39 On appeal, Norring asserts that even if the unredacted version of Exhibit 14 was relevant, it was nevertheless inadmissible under WIS. STAT. § 904.03 because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. However, the circuit court determined that the admission of the unredacted exhibit did not prejudice Norring because although he "was charged at the Class G level, meaning he was accused of participating in a crime involving property worth more than $10,000," the case was ultimately submitted to the jury at the Class H level after Allen testified that the value of the stolen property posted for sale on Norring's Facebook page was $6,000. The court reasoned, "By submitting the case to the jury at a Class H level, Mr. Norring received the benefit that the redactions to Exhibit 14 would have provided." The court also noted that the jury ultimately "returned a verdict at the Class I level," finding that the value of the stolen property Norring received was more than $2,500 but not more than $5,000.

¶40 We agree with the circuit court that the jury's determination regarding the property's value shows that Norring "was not prejudiced by the admission of Exhibit 14 without redactions." Because the record conclusively shows that Norring was not prejudiced by his trial attorney's failure to object to the unredacted version of Exhibit 14, the court did not err by denying this ineffective assistance claim without an evidentiary hearing.

### B. Exhibit 39

¶41 For similar reasons, we also conclude that the circuit court properly rejected, without an evidentiary hearing, Norring's claim that his trial attorney was

ineffective by failing to object to pages 100-108 of Exhibit 39. As noted above, those pages contained photographs from Miller's Facebook account showing items that George claimed had been taken from his storage unit, as well as messages between Miller and an individual named Mike Eggum. Norring asserts that this evidence was not relevant because the items shown on pages 100-108 of Exhibit 39 "were not items that Norring had allegedly posted or received."

¶42 We agree with the circuit court that pages 100-108 of Exhibit 39 were relevant because the State charged Norring with receiving stolen property *as a party to a crime* and alleged that he had aided and abetted Miller and Hirsch in selling the stolen property. Thus, as the court correctly reasoned, Norring's "alleged culpability was broader than the property he advertised on Facebook." Consequently, Miller's Facebook records were relevant because they tended to make a fact of consequence—that is, the extent of Norring's participation in the crime of receiving stolen property—more probable than it would have been without the evidence. *See* WIS. STAT. § 904.01.

¶43 Additionally, the circuit court correctly determined that the admission of the challenged pages from Miller's Facebook records did not prejudice Norring. The court noted that at the end of the trial, "the evidence was insufficient to link Mr. Norring to the entire inventory of stolen property," and the court therefore "fashioned the verdict to fit the evidence." The court further observed that because the jury found Norring guilty "at the Class I level, property worth between $2,500 and $5,000," it was "clear … that the jury was not confused because it limited Mr. Norring's guilt to the stolen items that he personally offered for sale." We agree with the court's determination that, under these circumstances, there is no reasonable probability that counsel's alleged error affected the outcome of Norring's trial.

¶44     Thus, the record conclusively shows that Norring was not prejudiced by his trial attorney's failure to object to pages 100-108 of Exhibit 39. Consequently, the circuit court properly denied this ineffective assistance claim without an evidentiary hearing.

### C. *Jury instruction on party-to-a-crime liability*

¶45     Norring next argues that his trial attorney was ineffective by failing to object to the circuit court's jury instruction on party-to-a-crime liability. The court's instruction tracked the standard party-to-a-crime instruction, WIS JI—CRIMINAL 400 (2005), stating:

> The State contends that Mr. Norring was concerned in the commission of the crime of receiving stolen property by either directly committing it or by intentionally aiding and abetting the person who directly committed it. If a person intentionally aids and abets the commission of a crime, then that person is guilty of the crime as well as the person who directly committed it.
>
> ….
>
> All twelve jurors do not have to agree whether Mr. Norring directly committed the crime or aided and abetted the commission of the crime. However, each juror must be convinced beyond a reasonable doubt that Mr. Norring was concerned in the commission of the crime in one of those ways.

¶46     Norring asserts that this instruction was deficient because the State

> presented alternating options to find Norring guilty of receiving stolen property as [a party to a crime]: either Norring directly committed the crime, or he was a party and participant to Hirsch's receipt of the stolen items, or he was a party or participant to Miller's receipt of the stolen property.

Norring contends that "where alternating modes of committing receiving stolen property as a [party to the crime] are submitted in evidence to support alternating

theories of liability, unanimity is required as to the specific mode or theory of commission." Norring argues, however, that the circuit court's instruction on party-to-a-crime liability "led to a situation where the jury was not required to be unanimous in its verdict."

¶47 Accordingly, Norring argues that his trial attorney should have objected to the instruction on party-to-a-crime liability and instead asked the circuit court to instruct the jury as follows:

> The defendant is charged with one count of [receiving stolen property as party of a crime.] However, evidence has been introduced of more than one act, [by the defendant and other parties,] any one of which may constitute [receiving stolen property as party of a crime.]
>
> Before you may return a verdict of guilty, all 12 jurors must be satisfied beyond a reasonable doubt that the defendant committed [and participated in] the same act and that the act constituted the crime charged.

¶48 This argument fails because the party-to-a-crime instruction that the circuit court gave correctly stated the law and did not deprive Norring of a unanimous verdict. "In criminal cases, the right to a jury trial implies the right to a unanimous verdict on the ultimate issue of guilt or innocence." *State v. Badzinski*, 2014 WI 6, ¶28, 352 Wis. 2d 329, 843 N.W.2d 29 (citation omitted). However, "[u]nanimity is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged, and unanimity is not required with respect to the alternative means or ways in which the crime can be committed." *Holland v. State*, 91 Wis. 2d 134, 143, 280 N.W.2d 288 (1979).

¶49 In *Holland*, our supreme court recognized that when a person is charged as a party to a crime under WIS. STAT. § 939.05, the jurors are not required to agree unanimously on the specific way in which the person was a party

17

to a crime. *Holland*, 91 Wis. 2d at 143. Instead, the jurors need only agree unanimously that the person participated in the crime in one of the possible ways listed in § 939.05. *Holland*, 91 Wis. 2d at 143. The supreme court later reiterated: "The Wisconsin case law is very clear that the jury need not unanimously agree as to in which of the alternative ways a defendant has committed an offense under the party to a crime theory. Rather, the jury must unanimously agree as to the defendant's *participation in the crime*." *State v. Hecht*, 116 Wis. 2d 605, 619, 342 N.W.2d 721 (1984).

¶50 In support of his argument that the circuit court's instruction on party-to-a-crime liability deprived him of a unanimous verdict, Norring cites *State v. Johnson*, 2001 WI 52, 243 Wis. 2d 365, 627 N.W.2d 455. The unanimity issue in *Johnson*, however, did not involve party-to-a-crime liability. Rather, the defendant in *Johnson* argued that his right to a unanimous verdict had been violated "because the State introduced evidence of more than the minimum number of sexual assaults required to constitute the crime, but the jury was not instructed that it had to agree unanimously on the specific acts of sexual assault before convicting him." *Id.*, ¶9. *Johnson*, which is materially distinguishable, did not overrule *Holland* or *Hecht*—either explicitly or implicitly. We are bound by *Holland* and *Hecht*, which are directly on point as to the jury unanimity issue that Norring raises on appeal.

¶51 Consistent with *Holland* and *Hecht*, the circuit court instructed the jurors that they did not need to agree unanimously whether Norring directly committed the crime of receiving stolen property or aided and abetted the commission of that crime, but they each needed to "be convinced beyond a reasonable doubt that Mr. Norring was concerned in the commission of the crime in one of those ways." The court's instruction accurately stated the law. As a

result, the record conclusively shows that Norring's trial attorney was not ineffective by failing to object to the party-to-a-crime instruction or request an alternative instruction. *See* **State v. Langlois**, 2018 WI 73, ¶50, 382 Wis. 2d 414, 913 N.W.2d 812 (explaining that an ineffective assistance claim predicated on a failure to challenge a correct jury instruction cannot establish either deficient performance or prejudice). Accordingly, the court properly denied this ineffective assistance claim without an evidentiary hearing.

### D. Jury instruction on value

¶52 Norring also asserts that his trial attorney was ineffective by failing to object to the circuit court's jury instruction regarding the value of the stolen property. Norring concedes that the court's instruction "followed the language in" WIS JI—CRIMINAL 1481 (2012), the pattern instruction for receiving stolen property. He contends, however, that the pattern instruction is flawed because it does not "include a time component by which the value should be measured." In contrast, he notes that WIS JI—CRIMINAL 1441 (2022), the pattern jury instruction for theft, specifically states that the jury must determine the value of the stolen property at the "time of the theft."

¶53 Norring was charged with receiving stolen property, contrary to WIS. STAT. § 943.34. That statute neither defines how the value of the stolen property should be determined nor specifies what time period jurors should use when assessing the property's value. *See* **id.** However, our supreme court has held that "[v]alue in the context of receiving stolen property is usually considered to mean 'fair market value' at the time of reception." **State v. Spraggin**, 71 Wis. 2d 604, 620, 239 N.W.2d 297 (1976) (citation omitted). Nonetheless, "[m]arket or replacement value at the point of theft is certainly relevant for grading [the]

offense." *Id.* "If there is no testimony or testimony that is subject to question as to credibility on the time of reception, the jury certainly may infer that the goods had a value equivalent to their value at the time of taking." *Id.* In addition, the "[o]riginal retail cost of the items would be relevant to this determination." *Id.*

¶54 When the circuit court's instructions to the jury are considered in their entirety, we conclude they appropriately conveyed that the jury was required to determine the value of the stolen property that Norring received as of the time that he received it. *See Langlois*, 382 Wis. 2d 414, ¶34 (explaining that jury instructions are considered "as a whole" when determining whether they correctly state the law (citation omitted)). The instructions did not specifically direct the jury to determine the property's value at the time of reception. However, the instruction setting forth the elements of the crime instructed the jurors that the State needed to prove that Norring knew the property was stolen "[w]hen the property was received." Shortly thereafter, the court instructed the jury that if it found Norring guilty, it should answer the question, "Was the value of the property more than $2,500?" We agree with the State that, when reading this verdict question, the jury would have reasonably assumed that it should determine the property's value at the time Norring committed the crime—that is, at the time he received the property.

¶55 Moreover, we emphasize—and Norring has conceded—that the circuit court's instruction on value tracked the pattern jury instruction for receiving stolen property, WIS JI—CRIMINAL 1481 (2012). Norring cites no case law holding that this pattern jury instruction fails to accurately state the law because it does not specifically direct the jury to determine the property's value at the time the defendant received it. Thus, Norring is essentially arguing that his trial attorney was ineffective by failing to raise a novel legal argument that WIS

JI—CRIMINAL 1481 (2012) does not accurately state the law. "[W]e do not consider trial counsel's performance deficient for any failure to raise a novel legal issue." *State v. Hailes*, 2023 WI App 29, ¶49, 408 Wis. 2d 465, 992 N.W.2d 835, *review denied*, 2024 WI 4, 5 N.W.3d 597.

¶56 Under these circumstances, the record conclusively shows that Norring's trial attorney did not perform deficiently by failing to object to the pattern jury instruction regarding the value of the stolen property. As such, the circuit court properly denied this ineffective assistance claim without an evidentiary hearing.

**III. The evidence was sufficient for the jury to find that the value of the stolen property Norring received exceeded $2,500.**

¶57 Finally, Norring contends that the evidence presented at trial was insufficient to support the jury's determination that the value of the stolen property he received exceeded $2,500. Whether the evidence was sufficient to sustain a guilty verdict in a criminal prosecution is a question of law that we review independently. *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410. A defendant "bears a heavy burden in attempting to convince a reviewing court to set aside a jury's verdict on insufficiency of the evidence grounds." *State v. Booker*, 2006 WI 79, ¶22, 292 Wis. 2d 43, 717 N.W.2d 676. When reviewing the sufficiency of the evidence to support a conviction, an appellate court "may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990).

¶58    It is the function of the jury, not this court, to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* at 506. "Thus, when faced with a record of historical facts which supports more than one inference, an appellate court must accept and follow the inference drawn by the trier of fact unless the evidence on which that inference is based is incredible as a matter of law." *Id.* at 506-07. Ultimately, if any possibility exists that the jury could have drawn the appropriate inferences from the evidence adduced at trial to find the defendant guilty, then we may not overturn the jury's verdict, even if we believe the jury should not have found guilt based on the evidence before it. *Id.* at 507.

¶59    Here, Norring challenges the sufficiency of the evidence to support the jury's value determination on two grounds. First, Norring contends that neither Allen nor George "used a relevant time marker for forming their opinions" regarding the value of the stolen property. Instead, Norring asserts that Allen's and George's opinions were "related to the various purchase prices of the items over many earlier years of acquisition." Norring therefore asserts that the State presented insufficient evidence to prove that the value of the stolen property he received exceeded $2,500 *at the time he received the property*.

¶60    As discussed above, while "[v]alue in the context of receiving stolen property is usually considered to mean 'fair market value' at the time of reception," "[m]arket or replacement value at the point of theft is certainly relevant for grading [the] offense." *Spraggin*, 71 Wis. 2d at 620 (citation omitted). Furthermore, the "[o]riginal retail cost of the items" is "relevant to this determination." *Id.* "Market value is not always precisely determinable, and the trier of fact should be allowed to hear all factors that would be considered in the market to evaluate property, including its original price." *Id.*

22

¶61 Additionally, as a general matter, "[a]n owner of personal property is competent to testify as to [his or] her opinion of the value of that property." ***Ensz's Est. v. Brown Ins. Agency, Inc.***, 66 Wis. 2d 193, 209, 223 N.W.2d 903 (1974). Thus, an owner's testimony regarding the original cost of his or her stolen property is relevant and admissible to establish the property's value at the time the defendant received it, *see id.*, but defense counsel "may attack such evaluations and call attention to the fact that original cost may not necessarily be equitable with the appropriate market figure for the period when the goods are charged as received," *see **Spraggin***, 71 Wis. 2d at 621.

¶62 With these principles in mind, we conclude the State presented sufficient evidence for the jury to find, beyond a reasonable doubt, that the value of the stolen property Norring received exceeded $2,500 at the time Norring received the property. Exhibit 14 listed each stolen item and its value. During his trial testimony, George explained how he and Allen determined the listed items' values. Specifically, he testified that they had receipts for "almost all of the Gundam" kits because they had been "recently" purchased, that they had recovered receipts from Lego.com for some of the bigger Lego sets, and that some of the values were based on memory or were obtained from people who had purchased the items. George further stated that for both the Lego sets and Gundam kits, the smaller sets sold for between $10 and $15, while the larger sets sold for a "couple hundred dollars."

¶63 Allen similarly testified that that the Gundam kits sold for "[a]nywhere from 50 to 200 bucks." Furthermore, Allen specifically testified, in response to a question posed by Norring's attorney, that the value of the items that Norring posted for sale on Facebook Marketplace was "[p]robably close to like

$6,000." Although not qualified as an expert, Allen was competent to provide that opinion. *See Ensz's Est.*, 66 Wis. 2d at 209.

¶64 While not precise as to timing, George's and Allen's testimony did include a temporal element to assist the jury in determining the value of the stolen property. Namely, George and Allen testified that while the Lego sets were purchased over a period of "a dozen years," the Gundam kits had been purchased more "recently." Moreover, the fact that George and Allen were able to recover receipts for some of the larger Lego sets from Lego.com suggests that those sets had been purchased more recently. Regardless, even for those items that had not been purchased recently, the jury could still consider the original purchase prices of those items when determining their value at the time Norring received them. *See Spraggin*, 71 Wis. 2d at 620.

¶65 Norring also argues that the evidence was insufficient to support the jury's determination regarding the value of the property because the circuit court instructed the jury that "value" means "the market value of the property or the replacement cost, whichever is less," *see* WIS JI—CRIMINAL 1481 (2012), but neither George nor Allen "provided proper proof of the *lesser* of the missing items' replacement cost or market value." According to Norring, "[i]n the absence of a jury verdict related only to the lesser amount received by Norring, the [circuit] court was required to find Norring guilty of a misdemeanor," rather than a felony. *See* WIS. STAT. § 943.34(1)(a) (stating that the crime of receiving stolen property is a Class A misdemeanor if the value of the property does not exceed $2,500).

¶66 Notably, the text of WIS. STAT. § 943.34 does not provide any definition of the term "value." Thus, WIS JI—CRIMINAL 1481 (2012), which is the pattern jury instruction for receiving stolen property, incorporates the definition of

24

"value" that is set forth in WIS. STAT. § 943.20, the theft statute. *See* § 943.20(2)(d). A pattern jury instruction, however, is not binding authority. *State v. Ellington*, 2005 WI App 243, ¶8, 288 Wis. 2d 264, 707 N.W.2d 907. Contrary to the pattern jury instruction for receiving stolen property, in *Spraggin*, our supreme court held that "[v]alue in the context of receiving stolen property is usually considered to mean 'fair market value' at the time of reception." *Spraggin*, 71 Wis. 2d at 620 (citation omitted). As explained above, the *Spraggin* court further held that the property's "[m]arket or replacement value at the point of theft" is relevant to determining its value, as is the "original retail cost" of the items. *Id.*

¶67    As the State and the circuit court have both correctly noted, Norring cites no binding legal authority in support of his argument that the State was required to produce evidence of *both* the property's market value *and* its replacement cost. We agree with the State that, under *Spraggin*, "[w]hat was [instead] required was that the *jury* determine value based on all factors the market uses to determine value, including original retail cost." In this case, the evidence summarized above was sufficient for the jury to make that determination. In particular, the jury had a sufficient basis from which to conclude that the value of the items Norring received exceeded $2,500 but did not exceed $5,000.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.